In Re R. D. H. S., a Minor.

No. 31722.

St. Louis Court of Appeals.

Missouri.

Sept. 17, 1963.

Rehearing Denied Oct. 14, 1963.

Witherspoon & Lewis, St. Louis, for appellant.

Charles M. Shaw, Claude Hanks, Clayton, for respondent.

RUDDY, Presiding Judge.

This is an original proceeding in habeas corpus tried by the court. The petition was filed in this court by the natural mother of a minor female child against the putative father of the child, who is in his care and custody, but not by virtue of any judgment, order or decree of any court, or by any provision of law.

It is alleged in said petition that the petitioner is single and unmarried and was single and unmarried at the time of the birth of said minor child and that she is lawfully entitled to the exclusive possession, custody, care and control of said child. It is further alleged in said petition that said minor child is illegally and unlawfully restrained of her liberty by the respondent, the putative father, and that the respondent has no legal right to the custody of said child. It is then alleged that respondent illegally holds said child under the mistaken idea that he has a right to the custody, care and control of said minor child, and that he had threatened to take the said child out of the State of Missouri. Petitioner prays for the issuance of a Writ of Habeas Corpus that said minor child may be placed in her custody.

In his return the respondent alleged that he has the care and control of the said minor child and that he is the natural father of said child and has had actual physical care and control of said child since the birth of the child; and that he has supported said child since her birth until the child was forcibly taken from the respondent's care and control by the petitioner during the month of June, 1963. Respondent in his return raises the question of the fitness of the petitioner to have custody of the child and, in support of his allegation, he charges

that the petitioner was living in a state of adultery when she forcibly took the care and control of the child during the month of June, 1963; that petitioner was neglecting the physical and mental health and welfare of said minor child; that petitioner was mistreating the minor child physically and mentally; that petitioner was in the habit of leaving the child unattended and improperly cared for by persons not qualified to care for a minor child; and that while petitioner had the minor child in her control, she did not properly feed or clothe said child.

In her answer to respondent's amended return, petitioner admits that respondent is the putative father of the said child and denies all other allegations contained in said return.

Petitioner testified that she is twenty-seven years of age. She has never been married; however, has had two children including the child which is the subject of this proceeding. The child involved was born on February 12, 1962, in St. Louis, Missouri. She admitted that respondent is the father of said child. After the birth of the child, she took care of her for six weeks; thereafter, she returned to work and asked respondent's aunt, Mrs. H., to take care of the child while she was employed. Prior to the child's birth, petitioner worked at the Christian Hospital for two and one-half years and since leaving there she has been employed at the Normandy Hospital, where she has worked for approximately sixteen months, giving as her salary $160 to $170 per month. This arrangement with Mrs. H. continued from March, 1962 until May, 1962 when the petitioner obtained a room at Mrs. H.'s home and would take care of the child after her employment. She continued to live at the home of Mrs. H. until July 17, 1962, at which time petitioner and respondent agreed that the respondent's mother would keep the baby, with the understanding that petitioner could have the child anytime she wanted her.

Petitioner further testified that she corresponded with respondent's mother while the child was living with respondent's mother in Macon, Mississippi. During the Christmas Season of 1962, petitioner visited the child at Macon, Mississippi, and, when leaving there, took the child to Phillips, Mississippi, the home of her parents. After visiting at the home of her parents, the petitioner arranged with the respondent's mother to have the baby returned to Macon, Mississippi. Petitioner stated that if she did not hear from respondent's mother for three or four weeks, she would call her on the telephone to inquire about the child. In January, 1963, the child was brought from Macon, Mississippi, and left with Mrs. H. During this visit of the child, the respondent was hospitalized and during his stay in the hospital the petitioner, learning the child was at the home of Mrs. H., visited at said home and took the child with her to petitioner's own home. At this time, her testimony indicates, she lived at 1179 Hodiamont Avenue in St. Louis, Missouri. In her testimony, petitioner does not indicate how long she had the child on this occasion. Her testimony indicates that she saw the child again on either June 4 or 5 at the home of Mrs. H., and that on June 7th she got the child from the home of Mrs. H. and kept her until August 20th, when the respondent took the child from the baby sitter who had the child in her care. She further testified that when the child was not with her, she would send the child clothes, gifts and toys on holidays such as Easter, Christmas and birthdays.

On August 5th, while the child was in petitioner's care, petitioner discovered a knot near the private part of the child's body. She said she took the child to Dr. Janice Robinson, who was not produced as a witness. The skin was not broken and the petitioner claimed that the knot resulted when the child fell off of a rocking horse on August 5th. She testified that respondent had told her that he was not married when he first met her; however, on the occasion of her Christmas visit to Macon, Mississippi, she saw respondent at his mother's home and at that time he intro-

duced a woman to her as his wife. She testified that he told her, "This is the reason I couldn't marry you, this is my wife." She testified that she observed on her visit to the home of the mother of respondent that the baby was clean and had been well taken care of by respondent's mother. She has seen the respondent with other girls and has seen him on several occasions with a girl she named as Jerry. She attends church on Sundays when she is not working. On the date respondent took the child, namely August 20th, she said she left home about 10:00 A.M., and left the child in the care of a baby sitter. Before she left home that morning, she had bathed and fed the child and had combed her hair. She said she never left the child unattended at any time and always had food and clothing for her. In concluding her direct testimony, she said she wanted the child.

In her cross-examination, the petitioner admitted that her first child (who is now 5 years of age) was born when she was unmarried. She stated that she received ADC payments for the support and maintenance of this child, which payments were stopped in December, 1961, because she did not go to the office of the agency paying the funds for an interview. The reason she gave for not going to the office was that she would have been cut off anyway when they learned that she was pregnant with the second child. She said that the place where she lives, namely 1179 Hodiamont Avenue, has four rooms, two of which are bedrooms. She admitted that Joseph Simmons lives at the address on Hodiamont Avenue and had lived there and that she moved into this place in June, 1963. She acknowledged that the only name on the mailbox was that of Joseph Simmons. She further admitted that Joe Simmons is married, but added that she plans to marry him when he obtains a divorce from his wife. She admitted having acts of intercourse with Joe Simmons, adding that she has also had them with other men. She indicated that these acts of intercourse still continued and that she knew that Joe Simmons was married when she engaged in these acts with him. She stated that Joe Simmons worked at Wagner Electric Company and that if he got home before she did from their respective places of employment, he would take care of the child.

The next witness for petitioner was the baby sitter, who testified that she was 14 years of age and was starting in the ninth grade of high school. She has known petitioner and respondent for some time. When the child was with petitioner, she would take care of the child during the day and this occurred every day except on the days petitioner was off from her place of employment and except on Sundays. She further testified that another woman lived at 1179 Hodiamont Avenue where Joe Simmons lived and she had seen Joe Simmons at this address and knew that he would take care of the child at times when petitioner was not present. She further testified that the petitioner visited her home in the company of Joe Simmons. On the 20th day of August, 1963, she was acting as baby sitter for the child and on this day she had occasion to visit a store. Upon returning from the store and while walking on a public sidewalk on Hodiamont, she said, respondent came up to her from behind, took the baby and told her to tell the petitioner that he had the child. She further testified that respondent did not threaten her or do anything to cause any harm.

The testimony of respondent shows that he was born June 1, 1933, at Macon, Mississippi. He was married at said place during the year 1950 or '51. Some time thereafter and before May 4, 1953, his wife left him and subsequently told him that she had obtained a decree of divorce. He had no children by this marriage. He came to St. Louis May 4, 1953, and has never married again. He is presently employed with the International Shoe Company and has been so employed for 11 years. He lives on Rock Hill Road in St. Louis County and, in addition to his employment at the International Shoe Company, is employed as

caretaker for the owners of the premises and improvements thereon on Rock Hill Road. The owners of these premises also live there and have provided respondent with a sleeping room and a shower room. He admitted being the father of the minor child. He said she was born February 12, 1962. After her birth the child remained with the natural mother for approximately six weeks, after which time petitioner informed the respondent that she could not take care of the child any longer and it was then agreed between respondent and petitioner that the child be left with the aunt of respondent, a Mrs. H. Mrs. H. kept the child for approximately two months. Thereafter, by agreement with the petitioner, respondent called his mother at Macon, Mississippi and asked her to come and get the child. Pursuant to his request respondent's mother came to St. Louis and took the child to Macon, Mississippi, where the child remained with respondent's mother until June, 1963. During this time, respondent paid his mother $40 per month for the keep of the child until January, 1963, and thereafter paid her $50 per month.

During the Christmas Season 1962 he visited the child at Macon, Mississippi, and while there met the petitioner who was also visiting the child. He said petitioner stayed overnight at the home of his mother and then took the child to Phillips, Mississippi, the home of petitioner's parents, for four days. He stated that his mother had to go to Phillips, Mississippi, and get the child and return her to Macon, Mississippi; that the petitioner has not visited the child since and that she returned to St. Louis shortly after visiting her parents at Phillips, Mississippi. Respondent admitted that when he and the petitioner met on this visit at his mother's home in Macon, Mississippi, he introduced petitioner to a woman, but said that he told petitioner this woman was his former wife and not that she was his present wife. Sometime in June of this year (1963) while respondent was on vacation, he brought the child to St. Louis. During the time the child was here, respondent and the child lived with respondent's aunt, Mrs. H. On June 7, about 5:30 P.M. while respondent was away from his aunt's place, the petitioner came to the house and took the child telling the aunt that she would only keep the child three or four days. Respondent said that petitioner then lived at 1179a Hodiamont and that the only name on the mail box was Joe W. Simmons. He said that petitioner told him she had moved in with Joe Simmons and that she and Joe were going to get married.

Respondent knew that petitioner had another child, namely, a boy 5 years old, and that he lived with petitioner at the Hodiamont address. He said that petitioner had told him that she had never been married. He said that petitioner did not return the child and on August 20 about 12:30 or 12:45 P.M., he went in search of the child and saw her on Hodiamont Avenue with the baby sitter, at which time, he said, the child was running up and down the street. It had on a shirt and short pants. He said her clothes and her body were dirty. He took the child to Rock Hill Road where he resides and works and gave the child a bath and fed her, stating she was hungry. On August 28, 1963, he turned the child over to his mother who returned with the child to Macon, Miss. On August 20, when bathing the child, he noticed a mark or knot on her private parts. He took her to the office of a doctor where she was examined. He said his mother has been taking care of the child ever since he got her back. Subsequent to picking up the child he called the petitioner on the telephone. She in turn called Joe Simmons to the phone who told the respondent that if he did not leave the child alone that respondent would get into serious trouble. Respondent denied knowing any girl named Jerry. Respondent told the court that if he is permitted to keep the child it is his intention to send her to his mother in Macon, Mississippi, for care and rearing.

The next witness for respondent testified that she lived at the Rock Hill Road address, where the respondent is caretaker, and that she and her husband are the owners of said property. She testified that respondent has been caretaker of their home and the premises surrounding it and has been a faithful and trustworthy employee and at all times clean in appearance and honest in his dealings. She said that respondent, to her knowledge, does not use intoxicants and that his character is good. She further testified that he had brought girls to the premises, but never entertained any of them in his own quarters. On August 20, when the respondent picked up the child on Hodiamont Avenue and thereafter took the child to the Rock Hill Road address, witness testified, that when she got home about 4:30 P.M., she saw the child and it had apparently been in the house about 1½ hours. She further testified that respondent had not cleaned the child, stating that he wanted her to see the child and the child's condition. She stated that the clothes of the child were dirty, the child's shoes were dirty, her hair needed combing and the child was hungry. She further stated that the child was bathed, put to bed and the child thereafter fell asleep. This witness further testified that on one Sunday morning, the date of which was not given, about 9:30 or 10:00 A.M., she was on an extension phone when respondent called the petitioner. Respondent asked petitioner if he could see his daughter and she heard the petitioner call to Joe Simmons who then came to the phone and told the respondent not to call there any more, that he could not see the baby and that if he persisted in seeing the baby that there would be plenty of trouble. She stated that respondent did not have a bank account and that he would give her the cash and she would write the checks that were sent to respondent's mother in payment of the maintenance of the child. These checks were $40 per month during the year 1962 and $50 per month thereafter. She further testified that she observed the knot on the female organs of the child and that the knot was about the size of an egg which had been reduced to the size of a marble when the child was taken back to Macon, Mississippi. When respondent's mother visited St. Louis she was permitted to stay at the home of the witness on Rock Hill Road. She said Joe Simmons called her on the phone at 2:30 A.M. on the Tuesday or Wednesday preceding the hearing. She did relate the conversation.

The next witness for respondent was the mother of said respondent, who testified, that she was 48 years of age and that she lived with her husband who was 47 years of age. Her husband worked for the General Box Company at Macon, Mississippi, for 12 years. She has lived at Macon, Missisippi, all of her life. She and her husband own their own home which consists of seven rooms and in addition to the child involved in this case she takes care of her sister's girl who is about six years of age. She has had the care and custody of the child involved herein practically all of the time since the child's birth. She got the child when she was about three months old and stated the child was now 18 months old. She has met petitioner several times and petitioner visited in her home last Christmas and stayed overnight. While petitioner visited the witness she did not take care of the child, but the child was taken care of by the witness. The petitioner on this visit took the child to Phillips, Mississippi, the home of petitioner's parents, where the child stayed for two days and nights. Thereafter, the witness drove to Phillips, Mississippi, and got the child after the petitioner had asked her to come for the child. In June of 1963 the respondent came to Mississippi and got the child, and the respondent, the child and the witness returned to St. Louis. While here the witness stayed with her sister, Mrs. H. She again saw the child about two weeks previous to the hearing at the premises on Rock Hill Road. When the child was brought back to St. Louis from Macon, Mississippi, in June there was no knot on the child, such as was later found when

the child was picked up by the respondent. She testified that she attended church regularly and that if the court permits the child to remain with the respondent she would take care of it.

In a habeas corpus proceeding involving the custody of a minor child the child's welfare and future well-being are of paramount consideration, and the rights and claims of the contending parties, even in the case of the parents themselves, must be subordinated to what the court may conclude will be for the best interests of the child.

The case of In re Duncan, Mo., 365 S.W.2d 567, was a habeas corpus proceeding that was originally filed in this court and was transferred by this court to the Supreme Court for the purpose of re-examining the existing law. The Supreme Court in its examination of the existing law said (365 S.W.2d 1. c. 571):

"In Ex Parte DeCastro, 238 Mo.App. 1011, 190 S.W.2d 949, 951, a habeas corpus proceeding by a parent seeking custody of her child from a third party on the basis of her natural right, the court said: 'There is, however, a still further issue which inheres in the case by reason of its subject matter. This is the issue of the welfare of the child, which is an issue always to be kept in view in all legal proceedings involving the custody and control of a minor child as to which the state stands in the relation of parens patriae. In other words, whenever a minor child is brought within the jurisdiction of a court for an adjudication with respect to the question of its custody, the child becomes the ward of the court; and in determining the question of its ultimate disposition, the child's well being is of paramount consideration, and the rights and claims of the contending parties, even in the case of the parents themselves, must be subordinated to what the court may conclude will be for the best interests of the child.

Ex parte Badger, 286 Mo. 139, 226 S.W. 936, 14 A.L.R. 286. * * * In such an instance the nature of the inquiry makes the proceeding one of an equitable nature; and the question of either party's strictly legal right will be measured in terms of the welfare of the child. Ex parte Badger, supra; 25 Am.Jur., Habeas Corpus, secs. 78–80; 39 C.J.S. Habeas Corpus § 41.' By analogy with the situations in which a parent is claiming custody by natural right instead of by court decree, and on the same principles, where there is no other forum for determining this issue, because no proper party is available to proceed in the divorce court, and there has never been an actual hearing to determine a child's welfare, our conclusion is that the court may hear and determine this issue in a habeas corpus proceeding."

The case of In re Richardet, Mo.App., 280 S.W.2d 466, is analogous in practically all respects, so far as the relationship of the parties is concerned, to the present proceeding before us for decision. The petition for writ of habeas corpus was filed by the natural mother of an illegitimate child to obtain custody of the child from the respondents, who were the parents of the putative father of said child. All of the principles of law necessary to an examination of the instant case under review can be found in the Richardet case. After pointing out in that case that the welfare of the minor child is a superior objective to which all other considerations must yield, we said:

"Parents as the natural guardians of their minor child are presumed to be fit and qualified to assume the custody of their children and the natural right of the parent should never be denied unless it is made manifest to the court that he or she for some strong and cogent reason is unfit or incompetent to take charge of the child or unless the welfare of the child himself for some special or extraordinary reason de-

mands a different disposition at the hands of the court. (Citing cases.)

"The foregoing rule of law applies to the natural parents of an illegitimate child. (Citing cases.)

"All else being equal a child of tender years will be given to the mother as against the father. (Citing cases.)

"The mother, as the natural guardian, primarily has the right to the custody, care and control of her illegitimate child, which right in the absence of an express statutory provision to the contrary, is superior to the right of the putative father or any other person, providing she is a fit and suitable person to act as custodian. (Citing cases and other authorities.)

"The custody of a child will not be awarded to its natural parent where that parent is not a fit and competent person to act as custodian. (Citing cases.)

"Respondents have the burden of proof on the issue of the fitness of petitioner to act as custodian having raised the question as an affirmative defense. (Citing cases.)

"In a habeas corpus proceeding between a natural parent seeking to obtain custody of his child and persons who hold the child without the sanction of any judicial decree, the fitness, competence and suitability of the parent to take charge of the child, when challenged, depends upon whether petitioner is guilty of wilful abandonment and wilful neglect to provide the child with proper care and maintenance; whether the child, if placed in the custody of the natural parent, would become homeless, or dependent upon the public for support or reduced to a state of habitual vagrancy or mendacity, or ill-treated, or that his life, health, or morals would be endangered by continued cruel treatment, neglect, immorality, gross misconduct or depravity upon the part of the petitioner. Cox v. Carapella, supra [Mo.App., 246 S.W.2d 513]." (280 S.W.2d l. c. 471.)

■ It is undisputed that the petitioner is the natural mother of the child involved and that the child was born out of wedlock, the mother being single and unmarried at the time of her birth. It is further undisputed that the respondent is the father of said child. There is no contention by the respondent that he holds custody of the child by virtue of any judgment, order or decree of any court and, as we said in the Richardet case, he has the burden of proof on the issue of the unfitness of the petitioner to act as custodian, having raised the question of her fitness in his return.

It takes very little analysis of the testimony we received in this case to demonstrate that petitioner is wholly unfit to have the custody of the child in question. Her own testimony reveals that she had little interest in the child since her birth. Six weeks after the birth of the child she returned to work and asked the respondent's aunt to take care of the child and shortly thereafter entered into an agreement with the respondent whereby the child would be removed from St. Louis, Missouri, to Macon, Mississippi, there to be maintained and cared for by the mother of respondent. She admitted that the baby was well taken care of by respondent's mother. She testified that she attended church on Sundays. Through this testimony she was seeking some kind of help or refuge from the court, but her actions and conduct betray her testimony that she attended church on Sundays. The fundamental teaching of all churches is to "Fear God, and keep His commandments: for this is all man." Ecclesiastes (12:13). Her testimony shows that she has failed to learn the meaning and significance of at least one of the commandments of the Lord. Her testimony reveals that she has led an adult life of sexual promiscuity. Obviously, she rejects the pattern of decent society to have children within the lawful bond of wedlock. The child whose custody is in question in this

**668**

proceeding is not her first child born out of wedlock, for she has another child five years of age which was born under similar circumstances. She has depended upon the public for the support of this child five years of age, having acknowledged that she did receive ADC payments until she became pregnant with the minor child in the custody of respondent. Her sexual indiscretions continue to this date. Her testimony reveals that she moved into the home on Hodiamont Avenue occupied by Joe Simmons. She knew Joe Simmons was married and despite this has admitted numerous and continued acts of sexual intercourse with him. In connection with these acts of intercourse, when she was questioned about them at the hearing, she seemed indignant when it was suggested that they took place only a few times. She hurriedly corrected this impression by stating that she had many acts of intercourse with Joe Simmons and volunteered the statement that she has also had them with other men. As we have shown in her testimony she indicated these acts of intercourse still continue.

█ It is further shown in the testimony that when petitioner did have the child in her custody she neglected to provide the child with proper care. On August 20, 1963, when the respondent took the child from the baby-sitter he found the child running up and down the street in a dirty and hungry condition and upon bathing the child found it to have a knot in its private parts, the size of an egg. We think this testimony, which we have related, demonstrates that petitioner is wholly unfit to care for this child and that the best interests and welfare of the child require that petitioner be denied her custody. We think the child should remain in the custody of respondent.

The testimony shows that respondent is an industrious person, that he has a record of eleven years continuous employment with International Shoe Company and, in addition, acts as caretaker for the home and premises located on Rock Hill Road in St. Louis County. We are satisfied that he has love and affection for this child. He has found an excellent home for the child, namely, the home of his mother and has faithfully supported the child while in the temporary custody of the mother. One of the owners of the property where he resides and over which he is caretaker, testified that he is a faithful and trustworthy employee, clean in his appearance and honest in his dealings. That he does not use intoxicants and that his character is good.

The child is obviously attached to the mother of the respondent and we say this because of our own observation of what took place in the courtroom when this matter was heard. When the mother of respondent was called to be a witness in the case the child refused to go to anyone else and clung tenaciously to the witness during her entire testimony. Such attachment, as demonstrated by this child in the courtroom, most certainly comes from loving care and attention bestowed on the child by the mother of respondent.

We are aware that if the custody of the child is turned over to respondent herein, that at least temporarily he will again place the child in the care of his mother. We see no harm in this connection but rather feel that it is for the best interests of the child for the respondent to place the child with his mother. The home of respondent's mother is large, her husband is employed and has been so employed for a number of years. The child while in her care seemed to be healthy and happy and an attachment, no doubt, founded on love and affection, has formed between respondent's mother and the child. Respondent is financially able to support the child. We are certain the child will be reared in the home of respondent's mother in an atmosphere of spirituality, for the respondent's mother testified that she and her husband attend church regularly.

It is our ruling that the petition be denied and that the custody of R. D. H. S., a minor child, be remanded to respondent.

WOLFE and ANDERSON, JJ., concur.