IN THE MATTER OF THE GUARDIANSHIP OF C.

Juvenile and Domestic Relations Court
Union County

Decided November 20, 1967.

Miss *Claire E. Welsh,* by special designation, appeared on behalf of *Eugene T. Urbaniak,* Deputy Atty. Gen., for New

Jersey Bureau of Children's Services, Dept. of Institutions and Agencies (*Mr. Arthur J. Sills,* Atty. Gen., attorney).

*Mr. Edward J. Seaman,* for the putative father (*Messrs. Seaman, Williams & Seaman,* attorneys).

KENTZ, J. J. & D. R. C. This is an application filed by the New Jersey Bureau of Children's Services, Department of Institutions and Agencies (hereinafter referred to as the Bureau), pursuant to *N. J. S. A.* 30:4C–15(c) for guardianship of an illegitimate child born November 30, 1966. The mother of the child has consented to the Bureau's petition by executing a surrender of custody certificate. The putative father, however, has objected and himself seeks the custody of the child.

The questions raised in this proceeding are whether the putative father of an illegitimate child has standing to question the custody of such child where the child's mother has freely given her consent to the commitment of the child to a public agency for adoption placement and, if so, whether he has a right to custody of such child which is superior to that of a third-party stranger. Because standing and the right of custody are, under the facts here presented, interchangeable concepts, they will be discussed together.

After an exhaustive review of the related law in this State, it would appear that these questions have never been precisely resolved either by our decisional law or by the Legislature.

Although the issues raised here are unique in New Jersey, the question of the father's right to custody of his illegitimate child has arisen in many other states. In most of those jurisdictions the father has been held to have the right of custody. See *Lewis v. Crowell,* 210 *Ala.* 199, 97 *So.* 691 (*Sup. Ct.* 1923); *Caruso v. Superior Court, etc.,* 100 *Ariz.* 167, 412 *P. 2d* 463 (*Sup. Ct.* 1966); *In re Guardianship of Smith,* 42 *Cal. 2d* 91, 265 *P. 2d* 888 (*Sup. Ct.* 1954); *Mitchell v. Davis,* 24 *Conn. Sup.* 76, 186 *A. 2d* 811 (*Super.*

*Ct.* 1962) (paternal grandparents allowed to retain custody over mother's objections) ; *In re Brennan,* 270 *Minn.* 455, 134 *N. W.* 2d 126 (*Sup. Ct.* 1965) ; *Aycock v. Hampton,* 84 *Miss.* 204, 36 *So.* 245 (*Sup. Ct.* 1904) ; *In re R. D. H. S.,* 370 *S. W.* 2d 661 (*Mo. Ct. App.,* 1963) ; *Ex parte Schwartz-kopf,* 149 *Neb.* 460, 31 *N. W.* 2d 294 (*Sup. Ct.* 1948) ; *People ex rel. Meredith v. Meredith,* 272 *App. Div.* 79, 69 *N. Y. S.* 2d 462 (*App. Div.* 1947), affirmed 297 *N. Y.* 692, 77 *N. E.* 2d 8 (*Ct. App.* 1947) ; *Dellinger v. Bollinger,* 242 *N. C.* 696, 89 *S. E.* 2d 592 (*Sup. Ct.* 1955) ; *French v. Catholic Community League,* 69 *Ohio App.* 442, 44 *N. E.* 2d 113 (*Ct. App.* 1942) ; *Commonwealth ex rel. Human v. Hyman,* 164 *Pa. Super.* 64, 63 *A.* 2d 447 (*Super. Ct.* 1949) ; *Hayes v. Strauss,* 151 *Va.* 136, 144 *S. E.* 432 (*Sup. Ct. App.* 1928) ; *Wade v. State,* 39 *Wash.* 2d 744, 238 *P.* 2d 914 (*Sup. Ct.* 1951) ; *In re Aronson,* 263 *Wis.* 604, 58 *N. W.* 2d 553 (*Sup. Ct.* 1953). A more detailed reference will be made to some of these cases later in this opinion.

The remaining states, where there has been a judicial expression on this issue, have held that the father is not entitled to the custody of his illegitimate child. See *Clements v. Banks,* 159 *So.* 2d 892 (*Fla. Ct. App.* 1964) ; *Day v. Hatton,* 210 *Ga.* 749, 83 *S. E.* 2d 6 (*Sup. Ct.* 1954) ; *DePhillips v. DePhillips,* 35 *Ill.* 2d 154, 219 *N. E.* 2d 465 (*Sup. Ct.* 1966) (expressly denied by statute) ; *Butler v. Perry,* 210 *Md.* 332, 123 *A.* 2d 453 (*Ct. App.* 1956) (custody awarded to maternal grandmother over paternal grandparents; the decision was influenced in part by the fact that the putative father killed the mother in the home town of the paternal grandparents, and also by the fact that the putative father seemed content to leave the child with the maternal grandmother) ; *Ex parte Wallace,* 26 *N. M.* 181, 190 *P.* 1020 (*Sup. Ct.* 1920) ; *Home of Holy Infancy v. Kaska,* 397 *S. W.* 2d 208 (*Tex. Sup. Ct.* 1966) ; *Thomas v. Children's Aid Society of Ogden,* 12 *Utah* 2d 235, 364 *P.* 2d 1029 (*Sup. Ct.* 1961). It should be noted that the decisions in New Mexico and Texas were based

on the fact that the putative father in those states had no correlative duty to support his illegitimate child.

In Oklahoma a child can be legitimated by the putative father taking him into his home and acknowledging him to be his child. He is then charged with the support and education of the child and is entitled to its custody, services and earnings. *Allison v. Bryan,* 21 *Okl.* 557, 97 *P.* 282 (*Sup. Ct.* 1908). Finally, in *Barrett v. Koppen,* 154 *A.* 2d 132 (*D. C. Mun. Ct. App.* 1959), the father was denied custody, not by any rule of law, but purely on the basis of the child's best interests. The subject matter is also dealt with at length in 37 *A. L. R.* 2d 882–889. See also 10 *Am. Jur.* 2d, *Bastards,* § 62, *pp.* 890–892, and "Visitation and Custody Rights of a Putative Father," 26 *Albany L. Rev.* 335 (1962). See also 10 *C. J. S. Bastards* § 17 *c, pp.* 83–84.

▪ In New Jersey, where legitimate children are concerned, it is well settled that parents have a natural right to the custody of their children. *Richards v. Collins,* 45 *N. J. Eq.* 283 (*E. & A.* 1889); *Lippincott v. Lippincott,* 97 *N. J. Eq.* 517, 519 (*E. & A.* 1925); *In re Mrs. M.,* 74 *N. J. Super.* 178 (*App. Div.* 1962).

*Chapter* 4C of *Title* 30, the chapter under which this action is being brought, states in pertinent part as follows:
"*N. J. S. A.* 30:4C–1.

This act is to be administered strictly in accordance with the general principles laid down in this section, which are declared to be the public policy of this State:
(a) that the preservation and strengthening of family life is a matter of public concern as being in the interests of the general welfare."

And under *N. J. S. A.* 30:4C–3 it is stated in part:

"The Bureau of Children's Services, in administering the provisions of this act, shall:
(a) Provide care and custody for children eligible therefor in such manner that the children may, so far as practicable, continue to live in their own homes and family life be thereby preserved and strengthened."

■ Where one natural parent of a legitimate child seeks custody against the other natural parent, the courts will award custody to the parent who can better provide for the child's welfare and best interests. *Fantony v. Fantony,* 21 *N. J.* 525 (1956). However, where a stranger seeks to retain or obtain custody he must show compelling reasons why the natural parents should be deprived of custody. *Hesselman v. Haas,* 71 *N. J. Eq.* 689 (*Ch.* 1906) ; *Ziezel v. Hutchinson,* 91 *N. J. Eq.* 325 (*E. & A.* 1920) ; *In re Judge,* 91 *N. J. Eq.* 395 (*Ch.* 1920) ; *Marcum v. Marcum,* 265 *P. 2d* 723 (*Okl. Sup. Ct.,* 1954). The court in *In re Judge, supra,* said:

"The infant's welfare, all matters considered, is paramount and compelling in the eyes of the chancellor as *parens patriae.* The parental right, however, is never lost sight of as an influential and determining factor. If in a contest, as here, between a parent and a stranger in possession, for the custody of an infant of tender years there is equality as to character, condition, habits and surroundings of the claimants, the natural right will prevail; mere material advantage to the child will not count against the inherent right. The strict legal right will not be subordinated unless circumstances of weight and importance connected with the welfare of the child exist to overpower it, and these circumstances must be such as to imperil the personal safety, morals, health or happiness of the child." (at *p.* 397)

■ Thus, it can be seen that the right of the parent of a legitimate child to the child's custody is strongly protected by public policy and legal precedent, and likewise the legitimate child's right to the support, protection and company of his natural parent is equally well protected. There is no physiological or biological difference between a legitimate and an illegitimate child, nor is there any reason to suppose there would be less feeling of love and affection between child and parent merely because the child was born out of wedlock. However, for reasons buried in the past and half forgotten, the law has reduced the status of a portion of humanity, called the individuals bastards, and withheld from them certain rights.

At common law a bastard was said to be the child of nobody, *nullius filius*. Under this theory an illegitimate child had no father known to law, nor even a mother. Because of the disgraceful circumstances of his birth, he was disqualified from certain public and religious positions. Rights of inheritance by, from and through a bastard were severely restricted. See 10 *Am. Jur. 2d. Bastards,* § 8.

In *Hammond v. Pensylvania R. R. Co.,* 31 *N. J.* 244, 251 (1959), a case dealing with the meaning of the word "children" under the Federal Employers' Liability Act, Chief Justice Weintraub stated that the purpose of the fiction of *nullius filius* was to prevent inheritance and that the sweep of this fiction should be contained by the reason for its invention.

At common law the putative father was under no duty to support his illegitimate child, and there is no legal duty to support today except as provided by statute. The first legislative act requiring the father to support his illegitimate child was enacted to prevent the child from becoming a charge on the municipality. *Borawick v. Barba,* 7 *N. J.* 393, 395–403 (1951) ; *Ousset v. Euvrard,* 52 *A.* 1110 *(Ch.* 1902). It was not until *L* 1929, c. 153, now *N. J. S. A.* 9 :16–2, 3, 4, was enacted that it was recognized that the father had a broader duty to support his illegitimate child which was not merely limited to saving the municipality the expense.

Prior to the passage of legislation changing the common law, the rights and liabilities of the parents of illegitimate children were explicitly outlined in *Ousset v. Euvrard, supra,* wherein it was said:

"Ordinarily the custody of an illegitimate child is with its mother; she has the right to the custody of the child, and she is charged with the duty of its support. She can ordinarily assert her right of custody against the father, to take the child from the father; and the court will aid her, and will recognize and vindicate her right as mother. The father has hardly any right at all of custody, if he has any at all which the law recognizes. His position is largely that of a stranger, an outsider, having no natural relation to the child or children. He may be chargeable for the support of the child, his illegitimate off-

spring, under statutory proceedings; but if those proceedings are taken, and he is compelled to furnish support for the child, it is on the theory that the child otherwise would be a public charge; and the proceedings which result in an order of filiation uniformly leave the child in the custody of the mother, and the putative father is made liable to furnish support to the child while it is in the custody of the mother." (at *p.* 1110)

Our former Chancery Court held, in *Hesselman v. Haas, supra,* that the mother of an illegitimate child had a superior right to its custody over a stranger. In *dictum* it expressed uncertainty whether the mother would have a superior right to that of the putative father.

In *Baker v. Baker,* 81 *N. J. Eq.* 135 (*Ch.* 1913), there was a controversy between a husband and wife living separately. They had two children, one of whom by the then existing law was illegitimate. The father of the children petitioned the court for their custody, or if that be denied, reasonable access to both children. A question of law was raised whether the putative father had a legal right of access to his illegitimate child. Counsel for the father, for some reason, declined to argue the question of custody. The court held that the father had such a right of access providing it was in keeping with the best interests of the child.

In discussing the issue the court stated:

"The books are singularly void of precedents relating to access to illegitimate children, and while this question appears never to have arisen, I see no reason in the nature of things why this court should in a proper case be debarred of a right to give access to illegitimate children as well as to legitimate ones. It is said that chancery is the *parens patriae,* and as such administers its jurisdiction for the benefit of infants. Why this jurisdiction should be confined to legitimates is not apparent. *Rossell v. Rossell,* 64 *N. J. Eq.* (19 *Dick*) 21.

 &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

The question is one of new impression and must be decided upon principle and not upon authority, yet the cases relating to the custody of illegitimates may throw some light upon the obligations which ought to be imposed upon the parties to a controversy like the present one. In the case of *Queen v. Nash,* 10 *Q. B. D.* 454, 52 *L. J. Q. B.* 442 (1883), Sir George Jessell said that the question of custody of an illegitimate did not depend upon the mere legal rights upon habeas

corpus, but upon equitable doctrines, and that regard was always had to the mother, the putative father and the relations on the mother's side, that in such case there was that sort of blood relationship which, although not legal, gives the natural relations a right to the custody of the child." (at *pp.* 136–137)

The court further said that the doctrine as enunciated in the *Queen v. Nash* case was affirmed in *Barnardo v. Mchugh,* (1891) *A. C.* 388, 61 *L. J. Q. B.* 721. It also stated that the same equitable principles applied to the custody issue in England should apply to the question of access.

*Baker v. Baker, supra,* was decided January 15, 1913. In April of that year the Legislature enacted *L.* 1913, *c* 331 now *N. J. S. A.* 9:16–1 which reads as follows:

"The mother of an illegitimate child, whether married or single, shall have the exclusive right to its custody and control and the putative father of such child shall have no right of custody, control or access to such child without the mother's consent. If, *however, it is proved that the mother is unfit to have the custody and control of such child, the Superior Court or any other court which may have jurisdiction in the premises may make any order touching the custody or control of such child which might heretofore have been made.*

"This section is intended to be declaratory of the existing law upon this subject and it shall, under no circumstances, be construed as an implication that the rights of such a mother have hitherto been less than as herein above defined." (Emphasis added).

It is significant to note from this statute that the mother has exclusive right to the custody and control of an illegitimate child and the putative father has no such right without the mother's consent. However, where a court determines that the mother is unfit it may award custody and control of such child in such manner as established prior to the enactment of this law. See *Baker v. Baker, supra.* In order to invoke this statute the mother must elect to exercise her exclusive right to custody and control and upon the exercise thereof she must be deemed to be fit to have such exclusive right. In the instant case the mother has not exercised this right to custody and control since she has

abandoned her interest and rights in and to the child by executing a surrender of custody certificate to the Bureau. Certainly, a court having jurisdiction of such matters should have the same right to make orders touching upon the custody and control of a child as permitted prior to the adoption of this statute, where the mother has abandoned and relinquished her right to exclusive custody and control, as in the case where the court determines her unfit. *Cf. Caruso v. Superior Court, supra.*

While the Legislature in 1913 recognized the mother's legal status as previously declared by the court, it did not alter the strict common law rule as to the father's legal status. He still was not recognized as the legal father and he had no legal duty to support the child except to prevent the child from becoming a public charge. See *Fischer v. Meader*, 95 *N. J. L.* 59 (*Sup. Ct.* 1920).

The recent case of *F. W. v. D. S.*, 83 *N. J. Super.* 144 (*Ch. Div.* 1964), also confirmed the fact that *N. J. S. A.* 9:16-1, did not alter the status of the putative father but merely was declaratory of the mother's right. A reading of this case discloses that it is factually distinguishable. Furthermore, the court did not discuss the effect of *L.* 1929, *c.* 153, now *N. J. S. A.* 9:16-2, 3, 4, which was enacted in 1929. The enactment of this legislation repealed the doctrine of *nullius filius* as far as custody is concerned and recognized the parent-child relationship between the illegitimate child and his putative father.

*N. J. S. A.* 9:16-2 reads:

"A child born out of wedlock shall be entitled to support and education from its father and mother to the same extent as if born in lawful wedlock."

*N. J. S. A.* 9:16-3 reads in part:

"Proceedings to enforce the obligations imposed by section 9:16-2 of this Title may be maintained by one parent against the other * * *."

██ The language used by the Legislature must be carefully noted. After stating that both mother and father have the duty of support, it is stated that one parent may maintain an action against the other to enforce this obligation. The Legislature refrained from giving this right to proceed solely to the mother. Instead, it used the word "parent." Clearly, if it had intended that the father had no such right it would have used the word "mother." Since by this act the father can maintain an action against the mother to enforce her obligation to support the child, he can no longer be considered a stranger. By having been given this power to appear in court on behalf of the child he logically should also have the power to question the custody of the child. Inasmuch as he has been given the status of parent under the statute, he should have the same right to the custody of his illegitimate child, if it be in the best interests of the child, as he would have if the child were born in lawful wedlock. Furthermore, since the father of the illegitimate child has been given the statutory duty to support and educate the child, independent of the bastardy proceedings, he should have the corresponding right to the custody of the child in a proper case.

As has already been stated, at common law the putative father was under no legal obligation to support his illegitimate child. His only duty was to the municipality in order to prevent the child from becoming a public charge. *Ousset v. Euvrard, supra.*

In *Ex parte Wallace, supra,* the Supreme Court of New Mexico denied the putative father's request for the custody of his illegitimate child. Under the law of New Mexico, as it then existed, the putative father was under no obligation to support the child. The court said in its opinion, in part:

"It would be a strange doctrine that would give to a man the custody of a child without casting upon him the correlative duty of supporting the child. It is the duty to support and maintain the child that gives to the father and mother the right to the custody of the child and to its earnings during minority." (190 *P.*, at *p.* 1024)

Likewise in *Home of Holy Infancy v. Kaska, supra,* the Texas Supreme Court said that its denial of custody to the putative father was consistent in that there was neither a statutory nor common law duty on the part of the father to support his illegitimate child. Both the New Mexico and Texas courts compared their holdings to those of other states where the father had an obligation to support the child and where he was given custody.

*Dellinger v. Bollinger, supra,* was a proceeding instituted by a putative father to obtain custody of his illegitimate child. The court, after stating the common-law rule, discussed North Carolina law requiring the parents to support their illegitimate children and making failure to support a misdemeanor. The court said that because of these laws the putative father had such an interest to provide voluntarily for the child's support and maintenance, or otherwise he could be compelled to do so by the court. It then stated:

"Aside from our statutory provisions we are constrained to hold that the interest of a putative father in the welfare of his illegitimate offspring is sufficient to authorize him to maintain a proceeding under the provisions of (*N. C.*) *G. S.* § 50–13 to have the child removed from environment detrimental to its welfare. In so doing, he may request the court to award the custody of the child to him so that he may provide the support and maintenance required by law." (at *p.* 594 of 89 *S. E. 2d*)

In *Baker v. Baker, supra,* it was implied by the court that the payment of support gave the father some right to at least visit the child. The court said at:

"It was stated on the argument that the father in this case was making a monthly contribution to the maintenance of the children. Why has he not a right to see the children and determine for himself whether the stipend is being properly administered? Why has he not an interest to satisfy himself by inspection that the illegitimate child is being properly clothed and nourished and that it has a proper home to live in, that care is being taken of its training, its education and its moral bringing up?" (at *p.* 137)

*N. J. S. A.* 9:16–2 requires both the father and mother of the illegitimate child to support and educate the child. By this statute the father was given the same duties that the mother previously alone had. See *Ousset v. Euvrard, supra.* The logical deduction to be drawn therefrom is that both father and mother would have the same rights. *N. J. S. A.* 9:16–1 has given the mother exclusive right to custody, but it would seem that when she abandoned her right she merely removed the impediment on the father's exercise of his right to custody.

 Since the father's duty to support and educate the child is to the same extent as if the child was born in lawful wedlock, it should follow that the father's right to custody should be almost as co-extensive. Thus, while his right is not as great as that of the mother, it is certainly far greater than that of a stranger.

It is clear that the present trend of legal and popular thinking is that a willing father of an illegitimate child should have a right to custody if it is in the best interests of the child, particularly where the mother has abandoned the child, either actually or constructively by surrendering the child to an agency for adoption.

 The mere fact that there are no statutes specifically governing this point should not deter this court from expressing what it considers the law should be today. The common law should not be viewed as a morass covered by a web of enlightened legislative acts; rather, it should be viewed as a living thing, filling the gaps left by the Legislature and pointing the way for future legislative acts. As was stated in *Zepeda v. Zepeda,* 41 *Ill. App.* 2d 240, 190 *N. E.* 2d 849 (*App. Ct.* 1963):

"Changing economic, social or political conditions, or scientific advancements, produce new problems which are constantly thrust upon the courts. These problems often require the remolding of the law, the extension of old remedies or the creation of new and instant remedies. * * *" (190 *U. E.* 2d, at *p.* 859)

While the question may, perhaps be somewhat unique in New Jersey, the solution is not without precedent in other jurisdictions.

In *In re Guardianship of Smith, supra,* the Supreme Court of California reversed an order giving custody of two illegitimate children to their adult sister and ordered custody be awarded to their father. The court said:

"It is setttled in this state that in either guardianship proceedings or custody proceedings in a divorce action, the parents of a legitimate child have preference over a non-parent and the custody shall not be given to a non-parent unless the parent is found unfit.

\* \* \* \* \* \* \* \*

When the mother and father of an illegitimate child are both alive and he has not been legitimated, the mother is entitled to his custody, services and earnings to the exclusion of the father. [Citations]. On the death of the mother the natural father is entitled to the custody of an illegitimate child if he is a fit person. See *Commonwealth ex rel. Harper v. Fuller,* 142 *Pa. Super.* 98, 15 *A. 2d* 518; *Hayes v. Strauss,* 151 *Va.* 136, 144 *S. E.* 432; *Aycock v. Hampton,* 84 *Miss.* 204, 36 *So.* 245, 65 *L. R. A.* 689; *Moritz v. Garnhart,* 7 *Watts, Pa.,* 302, 32 *Am. Dec.* 762; *People ex rel. Meredith v. Meredith,* 272 *App. Div.* 79, 69 *N. Y. S. 2d* 462, affirmed 297 *N. Y.* 692, 77 *N. E. 2d* 8. It has been held repeatedly that, while the best interests of an illegitimate child is the important factor, the parents of such a child have a superior claim as against the world to his custody if they are fit and proper." (265 *P. 2d,* at *pp.* 889–890)

The rule that where the mother of an illegitimate child is dead or abandons the child the putative father has the right to custody has been followed in the neighboring states of New York and Pennsylvania. See *People ex rel. Meredith v. Meredith, supra; Fierro v. Ljubicich,* 5 *Misc. 2d* 202, 165 *N. Y. S. 2d* 290 *(Sup. Ct.* 1957); *Commonwealth ex rel. Human v. Hyman, supra.*

The same rule was also recently reaffirmed by the Supreme Court of Minnesota in *In re Zink,* 269 *Minn.* 535, 132 *N. W. 2d* 795 *(Sup. Ct.* 1964), where the court said:

"There are numerous authorities upholding an award of custody of an illegitimate child to the admitted father as against the claim of various relatives of the child, such as grandparents, aunts, uncles,

sisters, etc., where the evidence showed the father to be a suitable person, or at least there was nothing to show him to be an improper person, and even though in some instances the relative or relatives contesting the right with the father were in a better financial condition than the father and just as decent and respectable. The general rule which we follow is that an award of custody of an illegitimate child to the admitted father as against the claims of relatives and welfare agencies may be approved under circumstances where the mother rejects the child and the putative father is competent to care for and suitable to take charge of the child; but such rights of custody must always be subordinated to the best interests and welfare of the child." (132 *N. W. 2d.*, at *p.* 798)

That this may be the rule in New Jersey was suggested by the court in *Baker v. Baker, supra,* in which the court quoted with approval from the English case of *Queen v. Nash,* where it was stated that regard was always had to the mother, the putative father, and the relatives on the mother's side.

But we need not be limited in our decision by the existence or nonexistence of legal precedent. In an article by Harry D. Krause appearing in *Family L. Q., p.* 10 (June 1967), it is stated:

"If the father is unwilling, his affection cannot be legislated. Given a willing father, however, the situation is different. Under present law, even the willing father has few rights with respect to his illegitimate child. No rational reason justifies not to hear the willing father who fairly and regularly contributes to the support of his child on issues such as the child's general welfare, including his custody and education. The willing father's rights also should extend to adoption matters, and the appropriateness of an adoption should be considered in the light of the interests of all three parties involved; the father, the mother and the child. Since there is nothing unacceptable in principle about terminating parental rights if the child's interest requires such action, consideration of the father's interest would not unduly hinder adoption proceedings or interfere with the child's upbringing."

A similar view was expressed in the case of *In re Brennan, supra,* which was an action brought by the father of an illegitimate child to obtain custody and to restrain adoption proceedings. The court stated:

"Courts are well aware of the just concern of welfare agencies in a sound adoption program and appreciate that such a program is essential to the best interests of a great majority of children born out of wedlock. Courts are aware that removal of children from adoptive homes following placement may be harmful and, if accomplished frequently enough, will deter qualified and deserving prospective parents from applying for an adoptive child. The courts are also aware that the uncertainty as to its status is not only harmful to the child but also frustrates and makes more difficult the work of the adoption agencies.

But we think it should be said in light of judicial experience that the expressed fears of the welfare agencies are not entirely warranted. It has not been the policy of the courts to prefer the claims of the unwed father as opposed to the claims of welfare agencies where the granting of the father's claim would be harmful to the child's welfare. * * *

But, as recent decisions indicate, courts express a natural and understandable willingness to listen to a natural parent who asserts a sincere interest in and concern for his child. Certainly, in the case before us, where a mother seeks to relinquish the child and refuses marriage to legitimate it, a court cannot well look with indifference on the interest of the father who wishes to raise and provide for it. Even though the out-of-wedlock father does not appear before the court in the most favorable light, he should nevertheless be given an opportunity to express his interest when the mother has relinquished the child. A sincere concern which springs from a sense of responsibility to his own flesh and blood is reason enough to permit him to be heard. Although this policy may present some risk for the adoption process, it should nevertheless be permitted where the claim is asserted promptly and under circumstances to minimize the risk of trauma to the child or to the adoptive parents which would accompany judicial acceptance of his assertion." (134 *N. W.* 2d, at *pp.* 131–132)

See also *In re Aronson, supra,* in which it was held that where a putative father voluntarily appears in juvenile court proceedings for transfer of the child's permanent care, custody and control to the Department of Public Welfare, he is a proper party to the proceedings, possessing a right of appeal, even though the proceedings are not jurisdictionally defective if he has not been notified thereof either by personal service or notification. *In re Zink, supra.*

In their memorandum filed with this court the Bureau contended that the putative father does not have a right to claim custody of the child because he has not been de-

clared to be the father in a proceeding instituted under either *chapter* 16 or *chapter* 17 of *Title* 9 of the *Revised Statutes*. (However, it should be noted that both the mother and father stipulated and agreed at the hearing that they were the natural parents of the child.) The Court of Appeals of Ohio was faced with the same question in *French v. Catholic Community League, supra.* The court stated the question as follows:

"Is the claimed father of an illegitimate child, when its mother has abandoned and surrendered its control, entitled to its custody without first having been adjudged the reputed father of the child?

\* \* \* \* \* \* \* \*

In answering the first query, we perceive little profit to be gained in a dissertation upon what would have been the rights of the parties under the common law. We choose to solve the problem upon the modern and more humanitarian view that these little unfortunates, who play no part in their conception, are entitled to the law's utmost favor. When the father of such a child publicly acknowledges its paternity, and continuously contributes to its support and welfare (here $10.00 per month), and is a proper person, he is next in law entitled to its custody, when the mother relinquishes or abandons its control. To say that such a father must first, by a public spectacle in a bastardy proceeding, acknowledge paternity or be adjudged the reputed father of the illegitimate child, before he can be considered the child's father and in his order entitled to the child's custody, is to require the doing of a useless and rather despicable thing. The public parading of the sexual misstep is not conducive of the infant's welfare or its peace of mind after it passes adolescence. It cannot enlarge the father's sense of responsibility. It might deter him from performance of his moral and legal duty. The question comes: Why require one to prove that which he freely admits? Such a course is far from the rule of modern practice." (44 *N. W. 2d,* at *pp.* 114-115.)

It has been generally held that under proper circumstances the putative father of an illegitimate child should have reasonable rights of visitation. *Baker v. Baker, supra.; Mixon v. Mize,* 198 *So. 2d* 373 *(Fla. D. Ct. App.* 1967). The cases dealing with granting visitation rights indicate the judicial temper towards the granting of custody. The subject was carefully reviewed by the Superior Court of Pennsylvania in *Commonwealth v. Rozanski,* 206 *Pa. Super.* 397, 213 *A. 2d* 155 *(Super. Ct.* 1965), which was an action

by a putative father to obtain visitation rights. The mother of the child opposed. In finding for the father the court expressly overruled an earlier decision in *Commonwealth ex rel. Golembewski v. Stanley,* 205 *Pa. Super.* 101, 208 *A. 2d* 49 (*Super. Ct.* 1965), where it had held a putative father should never be given visitation rights. The reasons for granting rights of visitation to a putative father are equally applicable in cases such as the instant one where the putative father seeks custody of his illegitimate child.

■ As stated above, the public policy of this state is to keep legitimate children with their natural parents unless they are unfit or have abandoned the child. This is so even though strangers could provide a better home. There are, no doubt, many reasons for this policy but among which can be seen a judicial realization that natural parents would have a vital interest in the welfare and best interests of their offspring. This vital interest, based on a biological inheritance of flesh and blood, will make the parent retain his concern during times of frustration, which on occasion arise in all parent-child relationships where one named the parent by adoption papers may yield to the pressure to forget the child.

Can it be argued that this bond of blood is any less strong where the child was born out of wedlock? Love can neither be created nor destroyed by law. The love between a parent and his child is universal to humanity; it is not governed by the local laws of marriage and legitimacy. Can it be said a father loves his child only when he is married to the child's mother?

There has been no evidence presented to this court to indicate that this child was the product of a rape or an act of prostitution. There is thus no reason to assume that this child was an unwanted by-product of lust. The child's parents must have had some awareness of the possibility of conception and must have assumed a duty to in some way care for the child when it should be born. For reasons of their own, not ours to ponder, the parents did not marry

each other. But this in no way lessened the duty of each to provide for the child.

The mother sought to discharge her duty by giving up the child to the Bureau. The father, however, urged by his vital interest in the welfare of his son comes before us seeking the child. The mother has no power to discharge the father's duty nor can she extinguish his vital interest. Therefore, if the father of this child is in other ways a fit and proper person, he has the right to the custody of his illegitimate child.

As it has already been pointed out, the determining rule in custody or adoption cases is what is in the best interests of the child. *Lavigne v. Family and Children's Society of Elizabeth,* 11 *N. J.* 473, 479 (1953) ; *Fantony v. Fantony, supra; In re Mrs. M., supra; Sheehan v. Sheehan,* 51 *N. J. Super.* 276, 291 (*App. Div.* 1958) ; *Salmon v. Salmon,* 88 *N. J. Super.* 291 (*App. Div.* 1965). In order properly to make this determination the court must consider the willing father of an illegitimate child. Not to do this is to exclude a very important and necessary factor from consideration in the application of this rule.

Before concluding this opinion, however, we must consider a potential problem created by *N. J. S. A.* 9 :2–14 and 9 :2–19.

*N. J. S. A.* 9 :2–14 states that:

"Except as otherwise provided by law or by order or judgment of a court of competent jurisdiction or by testamentary disposition, no surrender of the custody of a child shall be valid in this State unless made to an approved agency *pursuant to the provisions of this act* or pursuant to the provisions of a substantially similar law of another State or territory of the United States or of the Dominion of Canada or of one of its provinces." (Emphasis added)

*N. J. S. A.* 9 :2–19 states in part:

"If the court shall determine that the child is illegitimate, the court shall declare that the father, and the husband of the mother if she be married, shall have no right to custody of the child."

This action was commenced by the Bureau. The Bureau is an arm of the State Government. In *N. J. S. A.* 30 :4C–1, it is stated that the act (*Title* 30, chapter 4C) is to be strictly governed by principles laid down in the statute. In *subdivision* (c) of *N. J. S. A.* 30 :4C–1, it is stated that as a matter of public policy the services performed by the Bureau should be performed by private agencies, and in subdivision (d) thereof, that the Bureau should only act where such private services are not available. From this policy declaration in favor of private agencies over the Bureau, the presumption arises that in some areas the Legislature may have created a double standard thereby encouraging the populace to seek the aid of private agencies as opposed to the Bureau.

 Being a body created by statute, the Bureau's powers are limited by statute. There can be no power unless granted by the statute creating it. *Rosenthal v. State Employees' Retirement System of N. J.,* 30 *N. J. Super.* 136, 142 (*App. Div.* 1954), and cases cited therein. See also *Welsh Farms, Inc. v. Bergsma,* 16 *N. J. Super* 295 (*App. Div.* 1951) ; *Tanis v. Passaic County,* 126 *N. J. L.* 303, 305 (*E. & A.* 1941) ; 1 *Am. Jur. 2d* 866 ; 81 *C. J. S. States* § 58, *pp.* 977–978.

The powers possessed by the Bureau are specified in *N. J. S. A.* 30 :4C–4. In *subdivision* (a) thereof it is given the power to "exercise general supervision over children for whom care, custody or guardianship is provided *in accordance with article 2 of this act.*" (Emphasis added).

It is significant to note that the custody and guardianship proceeding contemplated by the act is provided in Article 2 of the act. No reference is made therein to *Chapter 2* of *Title* 9.

In marked contrast note that in *subdivision* (b) of *N. J. S. A.* 30 :4C–4 the Bureau is given the power to "administer for the Department of Institutions and Agencies the powers and duties *provided in chapter 3 of Title 9* of the Revised

Statutes (Adoption)," and in subdivision (c) of the same section the Bureau is given the power to "administer for the Commissioner of Institutions and Agencies the powers and duties *as provided in chapter 7 of Title 9* of the Revised Statutes (dependent children; bringing into State)." (Emphasis added).

It must be emphasized that at no place does *Title 30, Chapter 4C* make reference to *Title 9, Chapter 2* (Care, custody and support). In contrast it may be noted that *Title 30, Chapter 4C,* has spelled out in detail the procedures and rules for situations where the Bureau is concerned with custody and guardianship. It would seem clear that if the procedure and rules under *Title 30, Chapter 4C,* were no more nor less than those under *Title 9, Chapter 2,* the Legislature would have made a reference thereto in *subdivision* (d) of *N. J. S. A.* 30:4C–4, as it did to *Chapter 3* of *Title 9* in *subdivision* (b), and *Chapter 7* of *Title 9* in *subdivision* (c). By reason of the absence of such reference to *Title 9, Chapter 2,* it would seem to follow that the latter is not applicable to a proceeding brought by the Bureau under *N. J. S. A.* 30:4C–1 *et seq.,* as in the instant case.

Further, the legislative intent to aid private agencies and the otherwise inexplicable use of detailed procedure in *Title 30, Chapter 4C,* covering custody and guardianship, make it clear that the Legislature provided for two similar, but independent, procedures for the guardianship of children—the one (*Title 9*) for private agencies, the other (*Title 30*) for the Bureau, and that therefore the requirement in *N. J. S. A.* 9:2–19, that the court must deny custody of an illegitimate child from his putative father, is not applicable to guardianship proceedings instituted under *N. J. S. A.* 30:4C–15(c) by the Bureau.

In view of the foregoing, it is the opinion of this court that the father of the illegitimate child has standing to oppose the petition of the Bureau in this type of proceeding and has the right to the custody of the child if upon

the evidence presented it would be in the best interests of the child.

An order will be entered accordingly and a hearing date will be fixed for a determination of the "best interest" issue.