## BALDWIN v. NIELSON.

No. 6908.   Decided June 19, 1946.   (170 P. 2d 179.)

See 46 C. J., Parent and Child, sec. 29; 39 Am. Jur., 598, 608.

For opinion on rehearing see 110 Utah 180, 174 P. 2d 437.

*Oscar W. McConkie* and *Elias Hansen,* both of Salt Lake City, for appellant.

*Charles Welch, Jr.,* of Salt Lake City, for respondent.

WADE, Justice.

Appellant Harvey Leo Baldwin sought a writ of habeas corpus in the District Court to obtain the custody of his son Ronald Leo Baldwin from the respondent Joseph George Nielson, Jr. This appeal is taken from a judgment of that court granting the custody of the child to the respondent.

The evidence discloses that in June, 1941, when appellant was about 21 years of age and while he was in the military service of the United States he married Ruby Hertha Nielson. Ronald Leo Baldwin, whose custody is the basis of these proceedings, is the issue of this marriage. Before Ronald was born, which was on March 4, 1942, appellant had received overseas orders and thereupon the couple gave up the apartment in which they had been living and went to live at the home of the wife's father. In this home there lived the wife's father, Joseph George Nielson, Sr., age 64, an unmarried brother, Joseph George Nielson, Jr., age 35, who is the respondent herein, and an unmarried younger sister, Vera Marie Nielson, age 23.

Ruby's mother had died when she and her sister were young children and her brother Joseph George Nielson, Jr., to whom we shall hereafter refer as George, gave up his trade as a barber to stay home and take care of the house and raise the younger children while the father attended to his business as a secondhand furniture dealer.

After Ronald was born, Ruby continued to live in her father's home with her child. Although appellant upon arriving at his overseas station had secured an allotment for his wife, for reasons not explained she did not receive this money until seven or eight months later, and when Ronald was born George and her sister Vera, who is employed as a stenographer in an insurance office, paid the expenses attendant upon his birth.

George suffers from arthritis of his hands and feet, but in spite of this he is a neat and meticulous caretaker of the house and grounds and has maintained these in such a manner as to make the home a pleasant place in which to live. He is greatly attached to Ronald and has fixed the back yard, which is very large, into an attractive and instructive playground for him. Ronald's mother was nearly always in very poor health and as a result, George assumed the greatest part of the care and attention which he required.

After appellant returned to the United States from his service overseas he visited his wife Ruby and her family on a few occasions when he was given leave from his army duties, but at these times he did not pay too much attention to his offspring, but appeared to be more interested in finding entertainment for himself, one form of entertainment being the drinking of intoxicating liquor brought by himself into the home of his in-laws. However, while at their home, he did not drink to the extent of becoming inebriated. At one time, when he was on furlough he took his wife Ruby and their child Ronald to visit his folks in Chico, California. While in Chico, he left his wife and child at his mother's home for about ten days during which time he went out with his brothers and sisters on drinking parties and was almost constantly intoxicated.

In December of 1944, Ruby procured a divorce from appellant and was awarded the custody of their child. In January, 1945, appellant married his present wife, Veleta Milner Baldwin, who is the mother of a two-year-old child by a former marriage. Before this hearing in the district court and upon advice of counsel, he remarried his present

wife. Since his discharge from the army he had not inquired about, nor did he send any money for the support and care of Ronald, although he did call and see him once in April, 1945, about a month before he was discharged from the army.

While serving overseas, appellant had contracted malaria. He was advised by doctors not to drink intoxicating liquors as that would aggravate his disease and he has followed this advice. In May, 1945 he was discharged from the army and since that time to the date of the hearing on October 29, 1945, he has worked only four weeks. He testified that the rest of the time he had spent in the mountains recuperating from his disease, although he hadn't had a serious attack of malaria since October, 1944. During this time he has lived on what little money he was able to save from his army pay, plus the $300 "mustering out pay" given him by the army and the amount he had received from the sale of a car which he had received in exchange for a more expensive one originally acquired by his first wife. He is a mechanic and has been promised a job which will pay about $280 per month.

On October 4, 1945, his former wife Ruby passed away, and upon being informed by George of her death he came to Salt Lake from California to take Ronald back with him. Ruby had requested her family to raise Ronald and George refused to allow appellant to take his son away, whereupon this suit was instituted by him to obtain his custody.

The court found the facts substantially as stated above, and in addition thereto found that the plaintiff did not demonstrate any real concern as to whether or not his wife and child were provided with money, having left them largely dependent upon the Nielsons for support; that he provided no money for their support from May, 1945 when he was released from the army to the time of the trial, although he had money with which to support them, and that he made no inquiry about the child until he was notified of the death of its mother; that he has not demonstrated that he is a fit and proper person to have the custody of the child and

that the best interests and welfare of the child dictate that he should remain in the home of the Nielsons;

"that plaintiff has not manifested such a stability in his marital relationships, in his financial status, nor in his attitude of general responsibility to justify taking the child from his present surroundings where he is well adjusted and happy."

From such findings, the court entered judgment awarding the child to the custody of Joseph George Nielson, from which judgment the plaintiff brings this appeal.

This court has repeatedly held that the paramount consideration in cases of this kind is what will be for the best interests and welfare of the child. *Harrison* v. *Harker,* 44 Utah 541, 142 P. 716; *Jones* v. *Moore,* 61 Utah 383, 213 P. 191; *Sherry* v. *Doyle,* 68 Utah 74, 249 P. 250, 48 A. L. R. 131; *Walton* v. *Coffman,* 110 Utah 1, 169 P. 2d 97. There is a presumption in a contest between a parent of the child on the one hand and a person who is not the parent of the child on the other hand, that it will be for the best interests and welfare of the child to be reared under the care, custody and control of its natural parents. Under such presumption the burden of persuading the trier of the facts is always on the person who claims that it will be for the best interests of the child to be reared by someone other than the natural parents of such child. In addition to this, such presumption is based on logic and reason and the general experience of the race, and in determining what will be for the child's best welfare this presumption of fact should be kept in mind and weighed along with all the other evidence in the case. *Walton* v. *Coffman,* supra.

This is an equity case and the appeal is on both the law and facts. It is therefore our duty to make an independent examination of the evidence and determine therefrom where the preponderance of the evidence is, always keeping in mind that the trial court had the opportunity of seeing and hearing the witnesses and therefore is in a better position to evaluate the weight which should be given to their testimony. See cases cited above.

The Nielsons are very much attached to this child; their home environment and moral standards are good; they are capable both financially and otherwise of taking care of his needs. Due to circumstances which were beyond his control, the father has not been with this child, nor become acquainted with him, and since his discharge from the army he has not shown sufficient interest in the child to provide for its support. His marriage to the child's mother was not an enduring one, and he showed considerable haste in marrying another woman since that divorce, and he has not obtained employment since he was discharged from the army. However, this period of his life covered by the evidence has been of great emotional upset to him. He has spent several years overseas, he was afflicted with malaria when he returned, and thereafter his wife divorced him. Under these circumstances, he could not be expected to act the same as he would under normal conditions. The presumption is that it will be for the best interest of the child to be reared in the care, custody and control of its natural parent. As soon as he learned of the death of its mother he came to get the child; prior thereto he did not have the right to its custody. There is nothing in this record that shows that he will not take his responsibility of making a good home for his child and rearing it properly. We therefore find that the preponderance of the evidence is to the effect that the interests and welfare of the child will be best subserved under the care, custody and control of its father.

The case is reversed with directions that the district court take further proceedings in accordance with the views herein expressed to award the child to the plaintiff. Plaintiff to recover his costs.

McDONOUGH and PRATT, JJ., concur.

LARSON, C. J., concurs in the order made.

WOLFE, Justice (dissenting).

I dissent. I cannot bring myself to send this child of four years from his present surroundings where the trial court

found he was "well adjusted and happy" into a home where a step-mother expressed herself as not being enthusiastic about having him and where the interest of the father appears to me to be one rather of proprietorship than of parental love. If this were a case of taking a child away from a parent not shown to be unfit and placing it in new surroundings I would think differently. This is a child of tender age. If it is not happy in its environment life could be bitter indeed. The disappointments and unhappiness of children can be especially poignant because they have not yet formulated a philosophy to adjust to them and they are incapable of understanding the reasons for abuse and mistreatment or even misfortune. And they are helpless. The court had the parties in this case before it. It is in a better position than we are to judge whether it would be to the best interests and welfare of the child to place it in this entirely new and different environment. I recognize that

"there is a presumption in a contest between a parent of a child on the one hand and a person who is not a parent, that it will be for the best interest and welfare of the child to be reared under the care, custody and control of its natural parents."

In this case it would be reared by only one of its natural parents and that the father. The other would be a step-mother. The right of parents to rear their children does not rest on any proprietory interest in the children. And especially in the case of the father who copulates and begets, the claim is far less strong in that regard than that of the mother. Society is deeply concerned with the type of units which compose it—their education and character for citizenship.

The best instrumentality for the rearing and developing of young children yet discovered is the family. Living together in the family community life under the love and guidance which presumably its parents will give it, furnishes the training in cooperation necessary to fit the child for later integration into the larger community life. But this presupposes interested, loving and fit parents. But I think

that experience teaches us that whereas a good home is the finest environment in which to raise a child, a bad home may be the worst. The present great wave of child delinquency is not unrelated to the type of home into which luckless children are cast. There is no evidence that the father of Ronald is a bad man but he certainly did not display much interest in his child when the mother was alive, either before or after divorce. Allowing for the fact that he was sent into the army, it appears that he did not make use of the opportunities he had to visit Ronald and his deceased mother and when he did so he paid more attention to drinking than to his child. I think it would be precarious to take this child from its present surroundings and place it in the home of the heretofore rather indifferent father and a stepmother who was simply willing but not anxious or enthusiastic to receive him. It is too uncertain a situation in which to place a helpless child. I cannot see that it is for the child's best interest and welfare. I agree with the finding of the court that "the plaintiff has not manifested such stability in his marital relationships, in his financial status, nor in his attitude of general responsibility to justify taking the child from his present surroundings when he is well adjusted and happy."