322 P.2d 397

**Vernal K. FRONK, Appellant,**

**v.**

**The STATE of Utah in the interest of Vernal Floyd Fronk, Ricky Dean Fronk and Cindy Lee Fronk, Respondents.**

No. 8734.

Supreme Court of Utah.

Feb. 28, 1958.

5. See Rich v. Stephens, 79 Utah 411, 419, 11 P.2d 295, 298.

246

Patterson & Kunz, Ogden, for appellant..

E. R. Callister, Atty. Gen., Vernon B. Romney, Asst. Atty. Gen., for respondent.

WORTHEN, Justice.

Appeal from an order of the Juvenile Court of the First District, made June 10, 1957, depriving the parents, Vernal Fronk, the appellant, and his wife, Betty Fronk, of their three minor children. Appellant and Betty Fronk were married January 4, 1952.

Appellant was drafted into service about January, 1955, and returned home in the early part of 1957. In August, 1956, a petition was filed charging that the three minor children of appellant and Betty Fronk were neglected children, wherein it was alleged that the children became neglected by reason of the fact that the mother of said children had been living with a man not her husband. The Juvenile Court after a hearing and on September 7, 1956, found that the mother lived with said party, that she held herself out as his wife and represented that the minor children were his. The court also found:

"That the said father on July 8, 1956, was accused and found guilty before a general Court Martial of the offenses of: possession of ration books not issued to said father, transfer of military payment certificates to an unauthorized person, counterfeiting a name on said ration books and failing to register a privately owned pistol."

By its decree the court left the children with the mother under the protective supervision of the Utah State Department of Public Welfare. The court warned that if the mother did not discontinue seeing the man, with whom she had been living, the children would be taken from her.

Thereafter the Utah State Department of Public Welfare requested that the judgment made on September 7, 1956, be modified.

The mother was present at the hearing but appellant was not. The court found that the mother had continued, from September 7, 1956, to the present time to associate with the man mentioned in the decree of that date.

The court entered a modified decree on November 19, 1956, as follows:

"That the Decree and Judgment heretofore made and entered herein by the Court on the 7th day of September 1956, be and is hereby modified as follows:

"That the mother and father of said children be and they are hereby deprived of custody of said children and said children be and are hereby committed into the custody of the Utah State Department of Public Welfare."

Thereafter and shortly after appellant returned home, his wife filed suit for divorce. He counterclaimed and he was

granted the divorce. The District Court of Weber County entered an order on June 7, 1957, on its own motion, transferring the matter to the Juvenile Court "to make such determination and, or recommendation as appears appropriate to him, regarding the present custody of said children, and, or whether not the parents should be permanently restrained from visiting the children and the children released for adoption." The District Judge ordered said hearing to be held in his courtroom at 3 p. m. June 10, 1957.

The District Court in its decree which was signed April 26, 1957, and filed June 7, 1957, declared as follows:

"It Is Further Ordered, Adjudged, And Decreed, that the care and custody of said children be, and it is, hereby awarded to the Weber County Department of Public Welfare *until further order of this Court,* and that the defendant, Vernal K. Fronk, is hereby required to deliver said children to said Department of Public Welfare before 9:00 o'clock a. m., on Wednesday April 24, 1957.

"It Is Further Ordered, Adjudged, And Decreed that *until further order of this Court,* the said minor children are not to be remaining with either party herein, or the mother of the defendant." (Emphasis added.)

In its Findings of Fact No. 5 the District Court found:

"That the defendant, Vernal K. Fronk is not, presently, a fit and proper person to have the care, custody, and control of said minor children because he *has not been shown* to be *law abiding, honest, or understanding of the children's needs or* welfare * * *." (Emphasis added.)

The District Court in Finding No. 4 found that "Betty May Garder Fronk is presently grossly immature, keeps company with men under circumstances seriously adversely *effecting* the community feeling toward the family unit * * * and is, therefore, not a fit and proper person to have the care, custody, and control of said minor children."

The Juvenile Court seemed to be of the opinion that it had jurisdiction of these children. The mother on April 19, 1957, filed a petition with the Juvenile Court alleging that conditions had changed and that she had filed for divorce from the father of the children, and asking that an investigation be made and that the children be placed in her custody. The Court on May 10, 1957, dismissed the petition but the minutes of said hearing disclose:

"May 10, 1957: *Court is in session.*

"Judge Ziegler: I am at a loss to establish the relevance of this petition. The only thing that seems to be

changed is the fact that Mrs. Fronk has sued for divorce.

"Attorney Barker: Are you familiar with the findings of the District Court.

"Judge Ziegler: Yes. I have a copy of the order.

"Attorney Barker: The divorce was granted to the father of these children not the mother.

"Mr. Leverich: We have had several contacts with the mother and she plans to live with her parents.

"Mr. Scott: We have been in a position where we have been unable to completely evaluate the homes of these people. Both parents have been out of the State for a considerable length of time. We are not in a position to solicit the cooperation of the parents in this matter and they apparently have been unaware of our role.

"Mr. Barker: There was a question as to which court has jurisdiction.

"Judge Ziegler: We have original jurisdiction and this jurisdiction is continuing. I do not believe the District Court have the power to review our jurisdiction. I am going to cite Black v. Anderson, [3 Utah 2d 42] 277 P.2d 975 where the question arose.

We are going to take the stand that we have the jurisdiction to decide the matter."

On June 10 the Juvenile Court held a hearing which resulted in the order from which this appeal was taken.

At that hearing the mother of the children testified that she wanted the children and that she could care for them.

Betty Fronk's mother testified that Betty had been living with her; that Betty had been attending church and that she did not drink. She testified that she had never approved of the association of Betty and the man she had been living with.

Appellant testified that he has a job at the Ogden Iron Works as an electrician; that he worked from 9 to 5 and received $1.95 per hour; that the children were in his mother's home about four days before the divorce hearing, and he spent most of his time with them when he wasn't working. He testified that he could take care of his children if given a chance; that his aunt could take care of them or that he could live with his aunt at her home. He said that he had made arrangements with his aunt who had a three-bedroom home in Ogden and that it was agreeable for him to reside in her home so that he could be with the children when not at work. He also stated that he would be willing to work under the close supervi-

sion of the court and the Department of Public Welfare if given an opportunity to have the children.

Appellant's aunt, Pearle Jenne, confirmed his testimony; she testified that she had a comfortable home with adequate room to provide a good home for the children. She stated that if Vernal were given an opportunity to have the children she would assist in raising them; that she could take them into her home and keep them and take care of them, and that Vernal could stay in the home; that there was plenty of room. She testified that she felt that Vernal is personally capable of taking care of the children; that she felt they would be better off with him than they could be with their mother; that she had the children with her for two days and noticed that they were very much attached to their father; they love him; that he is a devoted father.

Mr. G. Albert Wimmer testified that he was Bishop of the Ward in which Vernal Fronk and his parents are members; that he had known them for six or seven years; that he had been in their home. He testified that Sister Fronk, Vernal's mother, has three or four other children; that they are all established and have homes of their own; they have been participating in ward activities throughout the years he has known them; that he felt that if Vernal's mother would devote her time to the chil-

dren she could provide an adequate home for them; that since Vernal returned from military service he has attended church quite regularly. He stated that the mother of Vernal is working but he understands that she plans on making arrangements to care for the children if they are given to Vernal.

Arthur G. Pledger and his wife testified that they had known Vernal's family for a considerable time. Mr. Pledger had been Bishop of the 10th Ward for ten years and in the Farr West Stake Presidency for 11 years. Both testified to a close acquaintance with the grandparents of these children, Mr. and Mrs. David O. Fronk. Both testified that if given an opportunity Vernal and his parents could and would give the children a wonderful home. Mr. Pledger testified that he wouldn't mind trusting his children in that home.

Kent Leverich, Child Welfare Representative of Weber County Welfare Department, stated that his department found that they had not had sufficient time to evaluate the ability of the parents to care for the children. He gave no testimony as to appellant or his fitness to be awarded the custody of his children, but he did state that the mother of the children had continued to associate with the man with whom she had been living. The witness stated that it would take from 6 months to 9 months to properly evaluate the situation

as to give an opinion as to whether the parents could properly care for the children.

The only testimony as to appellant's unfitness to be awarded the custody came from his former wife and his mother-in-law. His ex-wife stated that he went out with girls—but this occurred after the divorce; nor was there any testimony at that hearing or at any other time intimating that defendant had ever maintained any improper relations with any woman. Defendant's mother-in-law testified that she didn't know whether or not the appellant loved his children, and that he had been away so much that he hadn't been with the two younger children enough to find out. It is established by the record that the oldest child was under four when the order of June 10, 1957, was made. The two younger children were born February 6, 1955, and May 22, 1956. This father had had little opportunity to become acquainted with his children. The two younger children were born after he entered military service. It is not disputed that he made allotments for his children while he was in the army and that the same were received.

The Juvenile Court declared in its Finding of Fact No. 2:

"That the Court take judicial notice of the proceeding, Finding of Fact and Conclusions of Law and Decree entered by the District Court of the Second Judicial District in and for the County of Weber, State of Utah in the case of Betty May Garder Fronk, Plaintiff v. Vernal K. Fronk, Defendant, Civil Case No. 31760." (Emphasis added.)

After the testimony was in, and notwithstanding the recommendation of Mr. Leverich, Child Welfare Representative, Weber County Welfare Department, that it would take from 6 to 9 months to determine if either of the parents should have the children, the Juvenile Court immediately stated that he was reluctant to place the children for adoption, but felt that he had no alternative and said:

"* * * The court, under no circumstances, would consider returning these children to the father, and the court does not feel that the children should be returned to the mother * * *."

Thereafter the court entered its formal decree and judgment ordering that the mother of said children and the father of said children, "be and are hereby permanently deprived of custody of said children and said children be and are hereby committed to the Utah State Department of Public Welfare for the purpose of placing said children for adoption."

The Juvenile Court not only took judicial notice of the Findings of the Dis-

trict Court in the divorce action but made findings not based on the evidence adduced at its hearing but supported only by findings of the District Court.

The Juvenile Court did not have before it any evidence to establish appellant's unfitness to have the custody of his children. The mother of the children had been found unfit by the court upon substantial evidence including her improper relations with another man. She took no appeal. The Juvenile Court seemed to consider the District Court's Finding No. 5 as evidence. That finding is as follows:

"(5) That the defendant, Vernal K. Fronk, *is not, presently,* a fit and proper person to have the care, custody, and control of said minor children because he *has not been shown to be law abiding, honest, or understanding of the children's needs or welfare,* \* \* \*." (Emphasis added.)

Undoubtedly the findings of the District Court seemed ample for the Juvenile Court. However, even if there had been presented evidence, the foregoing finding is not a finding that appellant was not law abiding or that he was not honest or that he has no understanding of the children's needs or welfare. It is only a finding that defendant had not come forward to prove that he is a fit person to have the custody. It presumes him unfit and declares that he has not overcome that presumption.

We are of the opinion that the court's order was improper and unwarranted. The Juvenile Court should not have considered it too great a burden to wait six to nine months while the child welfare representative of the Weber County Welfare Department made an evaluation of the advisability of permitting the appellant to have custody of his children.

The Juvenile Court is established to safeguard the youth of this state against conditions that would be likely to lead to their loss as useful citizens. It was not created for the purpose of substituting persons, other than the natural parents, to take over the children. It should seek in every way, short of such a substitution, to preserve and maintain that bond of parental affection which has been throughout the existence of mankind the most potent force for safeguarding the interest and welfare of the oncoming generation.

The child welfare representatives of our state and county welfare departments are in a position to render valuable assistance to the Juvenile Court in discharging its duties. Both the Juvenile Courts and the child welfare representatives are under the supervision and control of the State Department of Public Welfare.

Section 55-10-62, U.C.A.1953, provides:

"\* \* \* and the juvenile courts are authorized to seek the cooperation

of all societies or organizations, public or private, having for their object the protection or aid of children in order to carry out the provisions of this chapter."

The District Court of Weber County in the divorce action awarded the care and custody of the children to the Weber County Department of Public Welfare, until the court's further order. The Juvenile Court committed the custody of the children to the Utah State Department of Public Welfare. Yet the court ignored the recommendation of the child welfare representative that an opportunity be afforded for the Department to investigate and evaluate the situation.

 We are of the opinion that not only did the Juvenile Court abuse its discretion in permanently depriving the appellant of the custody of his children, but that on the basis of the evidence adduced it could have made no proper decision except to award the custody to appellant.

Appellant produced an abundance of testimony that the children would be well cared for if awarded to him with the assistance and help of his aunt or his mother. His aunt, his Bishop and other family acquaintances gave testimony which the court completely ignored in concluding as he did.

Appellant testified that he was regularly employed and was receiving a good income and worked from 9 to 5, and his testimony was never disputed in any way. He testified that if he were given the custody of his children he could give them a good home and would be glad to work under the close supervision of the court and the Department of Public Welfare.

Let us assume that the appellant prior to his return from service had been guilty of acts and conduct of which he could not be proud. However, it must be remembered that he was under heavy strain and emotion when it was disclosed that his wife and his children were living with another man whom she held out as her husband.

After his wife sued for divorce and after the court gave it to him on his counterclaim, his attitude toward his children seems commendable. She has evidenced an intention to marry the other man and appellant has evidenced an intense interest in his children.

Nor is the fact alone of his having been convicted of a felony by a military court sufficient to deny him the opportunity to rehabilitate himself and his little family. Appellant has paid in full for his misdeeds. As was recently said by the California court in In re Minnicar's Estate:[1]

1. 141 Cal.App.2d 703, 297 P.2d 105, at page 108.

"Appellant is right in saying that the time at which fitness may be judged is the present and not the past, (citing cases) that the mere fact that a parent has been convicted of a crime and has served a prison term is not an automatic bar to the award of custody."

There is no evidence, nor is there any intimation, that appellant is or has been unchaste or that he has ever violated his marriage vows. Appellant shows industry and a desire to salvage his family, which he has had no opportunity of doing before.

In Re State, in Interest of Bennett,[2] this court at page 254 of 77 Utah, at page 966 of 293 P. said:

"It has always been the policy of both the Legislature and the courts of the various states not to deprive or interfere with the important and sacred relation of parent and child unless absolutely necessary for the welfare of the child or for the protection of society. * * *"

It does not necessarily follow from a finding that children are neglected that an order must be made depriving the parents of custody.

Section 55–10–30, U.C.A.1953 provides that if the judge finds the juvenile to be delinquent, dependent, or neglected, he shall enter in writing the fact constituting such delinquency, dependency, neglect or other offense, and may adjudge and decree as follows:

"(1) That the child be placed on probation or under supervision *in his own home,* or in the custody of a relative or other fit person, upon such terms as the court shall determine;

\*　\*　\*　\*　\*　\*

"(4) That the child be placed under such guardianship or custody as may be warranted by the evidence and for the best interest of the child; provided, however, *that in the selection of a guardian the court shall give due consideration to the preference of parents.*" (Emphasis added.)

In the case of Baldwin v. Nielson[3] the following appeared from the court's statements. In June, 1941, when appellant was about 21 years of age, and while he was in the military service of the United States, he married Ruby Nielson. Ronald Leo Baldwin, whose custody was the basis of those proceedings, was the issue of the marriage. Before Ronald was born, which was on March 4, 1942, appellant had received overseas orders and he and his wife gave up their apartment and moved into the home of Ruby's father. After Ronald was born, appellant's wife continued to live in her father's home. After appellant

2.　77 Utah 247, 293 P. 963.　　　　3.　110 Utah 172, 170 P.2d 179.

returned from overseas duty he visited his wife a few times but did not pay too much attention to Ronald. In December of 1944, his wife divorced him and was awarded the custody of Ronald. After his discharge from the army in May, 1945, he did not send any money for the support of his son. In May, 1945, he was discharged from the army and since that time until October 29, 1945, when the case was heard, he had worked only four weeks. He was a mechanic and had been promised a job which would pay about $280 per month. In January, 1945, about one month after his wife divorced him, he entered into a bigamous marriage—a felony—with another woman; but before the hearing of the matter, and upon advice of counsel, he remarried that woman which marriage occurred after the end of the six-month interlocutory decree.

On October 4, 1945, the mother of Ronald passed away and he came to Salt Lake City from California to take Ronald back with him. Ronald's mother had requested her family to raise Ronald and appellant was not allowed to take him. He then instituted habeas corpus proceeding to recover the custody of his son. The trial court entered judgment against him and he appealed to this court.

This court, speaking through Mr. Justice Wade, and after setting out the facts as herein stated, reversed the trial court and ordered the custody awarded to appellant, and in the opinion at pages 175 and 176 of 110 Utah, at page 181 of 170 P.2d observed:

"The court found the facts substantially as stated above, and in addition thereto found that the plaintiff did not demonstrate any real concern as to whether or not his wife and child were provided with money, having left them largely dependent upon the Nielsons for support; that he provided no money for their support from May, 1945 when he was released from the army to the time of the trial, although he had money with which to support them, and that he made no inquiry about the child until he was notified of the death of its mother; that he has not demonstrated that he is a fit and proper person to have the custody of the child and that the best interests and welfare of the child dictate that he should remain in the home of the Nielsons; 'that plaintiff has not manifested such a stability in his marital relationships, in his financial status, nor in his attitude of general responsibility to justify taking the child from his present surroundings where he is well adjusted and happy.' From such findings, the court entered judgment awarding the child to the custody of Joseph George

Nielson ( the brother of Ronald's mother), from which judgment the plaintiff brings this appeal."

In the opinion in that case, Mr. Justice Wade used this significant language:

"This court has repeatedly held that the paramount consideration in cases of this kind is what will be for the best interests and welfare of the child. (Citing cases.) There is a presumption in a contest between a parent of the child on the one hand and a person who is not the parent of the child on the other hand, that it will be for the best interests and welfare of the child to be reared under the care, custody and control of its natural parents. Under such presumption the burden of persuading the trier of the facts is always on the person who claims that it will be for the best interests of the child to be reared by someone other than the natural parents of such child. In addition to this, such presumption is based on logic and reason and the general experience of the race, * * *."

We are of the opinion that this father should have an opportunity to rehabilitate this family by having the children placed in his custody.

The order, decree and judgment of the Juvenile Court is reversed and the case is remanded with directions that the custody of the children be delivered to appellant subject to the supervision of the Juvenile Court and the Welfare Department.

Costs to appellant.

McDONOUGH, C. J., and CROCKETT, WADE and HENRIOD, JJ., concur.