476 P.2d 1013

In re STATE of Utah, in the Interest of Baby Girl M.

Appeal of James N. THOMAS, Appellant.

No. 11607.

Supreme Court of Utah.

Nov. 9, 1970.

Ellett, J., dissented and filed opinion.

Ray G. Groussman, David S. Dolowitz, Salt Lake City, for appellant.

Vernon B. Romney, Atty. Gen., Verl R. Topham, Asst. Atty. Gen., Ronald J. Greenhalgh, Asst. Attys. Gen., Salt Lake City, for respondent.

CALLISTER, Justice.

James N. Thomas, alone, appeals from a decree of the Juvenile Court terminating his and the natural mother's parental rights in Baby Girl M.

Baby M was born on December 20, 1968. Three days later she was removed from the nursery of the Holy Cross Hospital upon a warrant to take her into custody on the ground that "she had been or was being ill treated and was dependent and neglected in a manner likely to cause her unnecessary suffering and to be injurious to her health and moral welfare." The accompanying petition alleged that James N. Thomas was the putative father of Baby Girl M; that the mother and father were not now married; that the mother in the past had expressed a desire to relinquish all parental rights to the child; that the mother in the past and at present exhibited severe and disabling emotional and psychological problems; that as a result of the severe emotional problems, the mother was unable to care for and to nurture the child properly; and, therefore, it was in the best interest of the child that the mother and putative father be deprived of the child's custody and that the child be placed in the immediate care and custody of the State Department of Public Welfare.

This matter came on for hearing on February 6, 1969; James N. Thomas appeared in court, acknowledged his paternity, and requested custody of the child, if the mother were deprived of her parental rights. Mr. Thomas testified that he and the child's mother had been married in 1958 and divorced in 1963, that they had intended to be remarried, but that the mother had been so upset by the loss of the child that the impending marriage had been postponed. The evidence indicated that during the mother's pregnancy, the two had resided together. Subsequent to this hearing but prior to the court's determination of the matter, Mr. Thomas filed a petition for custody of the child. He, again, acknowledged his paternity and alleged his love and affection and ability to support her.

In an order, dated April 3, 1969, the Juvenile Court determined that Mr. Thomas had no legal rights to the child because he was not the legal father, although he was the putative father; and, therefore, the court dismissed his petition for custody.[1] The court made findings of fact and rendered a decree terminating all parental rights of the mother and putative father and placed the child with the State Department of Public Welfare for adoption. The findings of fact were a reiteration of the allegations in the petition with the addition that the parents should be deprived of all parental rights.

On appeal, Mr. Thomas contends that a putative father, who has acknowledged his paternity, has custodial rights in his illegitimate child and that it is beyond the jurisdiction of the Juvenile Court to terminate such parental rights for any other reason than those set forth in Section 55–10–109(1), (a), (b), (c), U.C.A. 1953.

In essence, the decree of the Juvenile Court terminated the parental rights of Mr. Thomas on the ground that he had no rights, which dispensed with the necessity of a hearing to determine whether he was a fit and proper person to have custody of Baby M.

The State vigorously contends that the father of an illegitimate child has no right to its custody. It places great reliance on Thomas v. Children's Aid Society,[2] wherein this court held that under the specific statutory provisions, then in effect, Section 78–30–4, U.C.A. 1953, only the consent of the mother of an illegitimate child was necessary for an adoption.[3]

---

1. In this order, the court recited that Mr. Thomas had previously been deprived of the custody of two children by the Juvenile Court in September of 1965; since that time the children had lived in foster homes and court action had been required to force support payments; that he had been unable to provide for these children after 3½ years of foster care; and that it would be contrary to the best interest of Baby M to follow the same foster care pattern. There were no specific findings made in regard to the above facts. The sole facts adduced at the hearing were that the mother and father were divorced in 1963 and that their two sons lived in a foster home. In Fronk v. State, 7 Utah 2d 245, 251, 322 P.2d 397 (1958), this court found that an order of the Juvenile Court, concerning a father's unfitness to have custody of his children, was improper and unwarranted, where the findings had not been based on evidence adduced at its hearing but were supported only by findings of the District Court in a divorce action. It is a denial by due process of law for a court, in the process of rendering judgment, to consider evidence, which was not introduced at the hearing, and which the party, therefore, had no opportunity to know, cross-examine, explain, or rebut. State in Interest of Pilling v. Lance, 23 Utah 2d 407, 414, 464 P.2d 395 (1970).

2. 12 Utah 2d 235, 364 P.2d 1029 (1961).

3. Sec. 78–30–4 was amended in 1966; it is unnecessary to construe this statute in resolving the legal issue in the instant case.

Adoption proceedings are statutory in nature.[4] The State's argument in the instant case is similar to the one advanced in In Re T,[5] wherein the court responded:

This lawsuit is a child custody dispute. The adoption statute does not purport to establish standards for resolving such disputes concerning legitimate or illegitimate children or to vest in the probate court the power to do so.

In recognition of the fact that normally both parents of legitimate children exercise custody and that it is unusual for a putative father to do so, the adoption statute requires consent to adoption by both parents of a legitimate child and only that of the mother where the child is not legitimate. The legislative classification has a substantial basis in experience, is reasonable, and is essential to a workable adoption program.

The appellants assume that, since the mother's consent alone is required to authorize adoption of an illegitimate child, by her act alone a dispute concerning the custody of her child is finally resolved. We cannot agree.[6]

This is the first time that this court has been confronted with the issue of whether the father of an illegitimate child, who has publicly acknowledged it, has a legal right to the care, custody, and control of his child, assuming that he is a fit and proper person. Undoubtedly, the dearth of cases involving this issue is probably attributable to the provisions in Section 78–30–12, U.C.A. 1953.[7] The factual background in the instant case indicates that but for the acts of an alert social worker, who removed Baby M at three days of age from the nursery of the hospital where the mother was confined for the birth, Baby M would have been legitimated according to the statutory provisions.[8]

At common law a bastard is said to be filius nullius, the child of nobody, or

4. In Re Adoption of Jameson, 20 Utah 2d 53, 54, 432 P.2d 881 (1967).

5. 8 Mich.App. 122, 154 N.W.2d 27, 36–37 (1967).

6. Also see State in Interest of K___ B___, 7 Utah 2d 398, 404, 326 P.2d 395 (1958), wherein this court emphasized that a proceeding before the Juvenile Court to terminate parental rights is not one for adoption but one in the interest of the child.

7. "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth. * * * "

8. Section 230 of the Civil Code of California is identical to Sec. 78–30–12, U.C.A.1953. In Darwin v. Ganger, 174 Cal.App.2d 63, 344 P.2d 353, 358 (1959), the court stated: " * * * Where a man has no wife, he can publicly acknowledge his child notwithstanding the fact that he does not maintain a household into which the child is taken. [Citations

filius populi, the child of the people. Under the common-law theory an illegitimate child had no father known to the law, and indeed not even a mother. Illegitimacy was considered disgraceful, and a bastard was disqualified from certain offices. Rights of inheritance by, from, and through a bastard were severely restricted.[9]

The court explained the historical development in In Re T[10] as follows:

During those early times when it was said that a putative father could not have custody of his illegitimate child and the child was a ward of the parish, it would never have occurred to anyone that a woman could enjoy custody rights, as then, at common law, the father had the absolute right to the custody of his legitimate children.

\* \* \* \* \* \*

\* \* \* As the law developed and the mother obtained custody rights, the courts of chancery assumed jurisdiction to settle custody disputes between parents. [Citation omitted] With respect to illegitimate children, the doctrine of

*filius populi* was modified to recognize first in the mother, and later in the father, rights of custody. However, "rights" in children are relative, not absolute. \* \* \*

\* \* \* At about the same time that the mother came to enjoy joint custody with the father of legitimate children, it was commonplace to state that the primary right to custody of illegitimate children belongs to the mother and that her right is good against all including the putative father, or, conversely, the father has a custody right good against all but the mother. Annotations: Right of mother to custody of illegitimate child, 98 A.L.R.2d 417, 427, 431; Right of putative father to custody of illegitimate child, 37 A.L.R.2d 882.

The courts of various jurisdictions have explained the putative father's right to custody on a variety of grounds. The court In Re Guardianship of C[11] observed that the purpose of the fiction of *nullius filius* was to prevent inheritance and that the sweep of this fiction should be contained by the reason for its invention.[12]

---

omitted.] If the man is unmarried the 'family' referred to in section 230 may consist only of the father, mother, and the child. [Citations omitted.] Thus, an unmarried man may legitimize his offspring by living with the mother and child for a short period during which he represented the mother as his wife and the child as his own. \* \* \*"

9. 10 Am.Jur.2d, Bastards, Sec. 8, p. 848.

10. See note 5, supra, at p. 33 of 154 N.W. 2d.

11. 98 N.J.Super. 474, 237 A.2d 652, 655, 657–658 (1967).

12. See Sec. 74-4-10, U.C.A.1953: "Every illegitimate child is an heir of the person who acknowledges himself to be the father of such child, and in all cases is an heir of his mother; and inherits his or her

The court further stated that at common law the putative father was under no duty to support his illegitimate child. In 1929, N.J.S.A. 9:16–2, 3, 4, was enacted, and the New Jersey legislature recognized that the father had a broader duty to support his illegitimate child which was not merely limited to saving the municipality the expense. The court stated:

* * * The enactment of this legislation [N.J.S.A. 9:16–2, 3, 4] repealed the doctrine of *nullius filius* as far as custody is concerned and recognized the parent-child relationship between the illegitimate child and his putative father.

N.J.S.A. 9:16–2 reads:

"A child born out of wedlock shall be entitled to support and education from its father and its mother to the same extent as if born in lawful wedlock."

*   *   *   *   *   *

* * * Furthermore, since the father of the illegitimate child has been given the statutory duty to support and educate the child, independent of the bastardy proceedings, he should have the cor-responding right to the custody of the child in a proper case.

*   *   *   *   *   *

Since the father's duty to support and educate the child is to the same extent as if the child was born in lawful wedlock, it should follow that the father's right to custody should be almost as co-extensive. Thus, while his right is not as great as that of the mother, it is certainly far greater than that of a stranger.

It is clear that the present trend of legal and popular thinking is that a willing father of an illegitimate child should have a right to custody if it is in the best interests of the child, particularly where the mother has abandoned the child, either actually or constructively by surrendering the child to an agency for adoption.[13]

In 1965, the legislature enacted the Uniform Act on Paternity, Chapter 45, Title 78, Section 78–45a–1, U.C.A. 1953, provides:

The father of a child which is or may be born out of wedlock is liable to the

---

estate, in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock. * * * "

13. Also see In Re Shady, 264 Minn. 222, 118 N.W.2d 449 (1962); Commonwealth v. Rozanski, 206 Pa.Super. 397, 213 A.2d 155, 15 A.L.R.3d 880 (1965); In Re Brennan, 270 Minn. 455, 134 N.W.2d 126 (1965); Torres v. Gonzales, 80 N.M. 35, 450 P.2d 921 (1969); Caruso v. Superior Court In And For County of Pima, 100 Ariz. 167, 412 P.2d 463 (1966); Wade v. State, 39 Wash.2d 744, 238 P.2d 914 (1951); Application of "Norman," 26 Misc.2d 700, 205 N.Y.S.2d 260 (1960); and 50 Minn.L.Rev. 1071, Father of an Illegitimate Child—His Right To Be Heard.

same extent as the father of a child born in wedlock * * * for the education, necessary support and funeral expenses of the child. * * *

Section 78–45a–2 provides:

* * * If paternity has been determined or has been acknowledged according to the laws of this state, the liabilities of the father may be enforced in the same or other proceedings * *.

As the New Jersey court observed, since this enactment has cast upon the father the duty to support and educate his illegitimate child as if it were born in lawful wedlock, it should follow that the father's right to custody should be almost as coextensive. The rationale for the common law doctrine of *filius nullius* has been nullified by legislative action.

Other courts have propounded other theories for holding that the putative father's custodial rights are secondary only to the natural mother's. The court in Guardianship of Smith[14] cited Civil Code, Section 230 (which is identical to Section 78–30–12, U.C.A. 1953), and stated that unless the father had a right to custody, it was not probable that he would receive the minors into his home and legitimate them. In Fierro v. Ljubicich[15] the court stated that it was a fundamental principle that no court can, for any but the gravest reasons, transfer a child from its natural parent to any other person, since the right of a parent, under natural law, to establish a home and bring up children is a fundamental one and beyond the reach of any court. This rule applies to illegitimate as well as legitimate children.

The common law doctrine of *filius nullius* has been superseded by legislative action. A statutory parent-child relationship has been established between the publicly acknowledged child and his putative father that places the child in parity with a legitimate child in rights of support, education, and inheritance.

The putative father of an illegitimate child is entitled to its custody and control as against all but the mother, if he is competent to care for and suitable to take charge of the child and if it appears that the best interest of the child will be thereby secured.[16]

This cause is reversed and remanded to the Juvenile Court with an order to set for hearing and plenary determination of the petition of James N. Thomas on the question of his right to the custody of Baby Girl M.

14. 42 Cal.2d 91, 265 P.2d 888, 37 A.L.R. 2d 867 (1954).

15. 5 Misc.2d 202, 165 N.Y.S.2d 290 (1957).

16. 37 A.L.R.2d 882, Anno: Right of putative father to custody of illegitimate child.

CROCKETT, C. J., and TUCKETT and HENRIOD, JJ., concur.

ELLETT, Justice (dissenting).

I dissent.

The appellant, a Negro, and the mother of the child, a white woman, lived together after the mother conceived a prior child during July 1958. That child was born April 13, 1959. The appellant and the mother went through a purported marriage ceremony in Idaho on June 18, 1959. This marriage was void for the reason that appellant at that time had a wife living from whom he was not divorced until April 4, 1960. This divorce became final July 4, 1960. Appellant and the mother were ostensibly divorced in 1963 although they had never been legally married to each other.

The mother gave her consent to the adoption of that child but later joined with appellant herein in attempting to secure custody of the child by means of a writ of habeas corpus.[1]

In that case a decision written by the author of the prevailing opinion stated:

    * * * The putative father of an illegitimate child occupies no recognized paternal status at common law or under our statutes. The law does not recognize him at all, except that it will make him pay for the child's maintenance if it can find out who he is. * * *

That statement is as true now as it was when written. An illegitimate father has no legal claim upon or legal right in or to the custody of his child unless such claim or right can be found in a statutory modification of the common law.

Under our statutes the only ways an illegitimate father can get any rights in the child are: (a) publicly acknowledge the child as his own and take it into his home with the consent of his wife, if married, and treat it as if it were legitimate;[2] (b) marry the mother after an adjudication of being the father is made in a bastardy proceeding;[3] (c) contingent rights after an adjudication of paternity in a bastardy proceeding;[4] (d) adoption of the child;[5] (e) possibility of some court declared rights after a judgment requiring support pursuant to the Uniform Act on Paternity.[6]

This appellant has not been adjudged to support the child in question nor has he either married the mother or taken the

---

1. Thomas v. Children's Aid Society of Ogden, 12 Utah 2d 235, 364 P.2d 1029.

2. Sec. 78-30-12, U.C.A.1953.

3. Sec. 77-60-14, U.C.A.1953.

4. Sec. 77-60-12, U.C.A.1953.

5. Chap. 30, Title 78, U.C.A.1953 as amended.

6. Chap. 45a, Title 78, U.C.A.1953 (1969 Pocket Sup.).

child into his home and treated it as if it were legitimate. While he did publicly acknowledge his paternity during the court proceedings, he has not qualified under any of our statutes as having any rights in or to the child.

The Juvenile Court is given exclusive authority to terminate all legal parent-child relationships,[7] and the statute sets forth the grounds upon which that relationship can be terminated.[8] The point to be kept in mind, however, is that the illegitimate father is *not a parent* within the meaning of the law.

Certainly such a father cannot maintain an action for damages under the wrongful death statute[9] nor could he have a preference in the appointment of a guardian for a minor under the age of fourteen years.[10] Such a father has no rights at all in the child unless and until he brings himself within some statutory provision which will afford them to him.

I cannot agree that the court terminated the rights of the appellant solely upon the grounds that he had no such rights. I am of the opinion that the court could have done so, but such was not the case in this matter.

Here the Juvenile Court gave notice to the appellant and to the mother that they should appear on February 26, 1969, at the hearing of a petition to terminate all parental rights in and to the child in question. Both parties appeared and testified. Other witnesses were sworn and examined and cross-examined by the State, the court, and by appellant's counsel.

Upon the conclusion of the evidence the appellant, through his counsel, moved for a continuance, which was granted by the judge. During the continuance the appellant filed a petition for custody of the child. Since the question before the court was whether the appellant and the mother should be deprived of all parental rights, the court did not need to have a further hearing on the petition and so denied it forthwith by the following order:

The above-entitled matter was before the Court on the 26th day of February, 1969, for a hearing on a Petition filed in the interest of the above child; subsequent to the hearing and prior to the decision made by the Court, the putative father of the child, James N. Thomas, filed a Petition for Custody and Affidavit and a Supplemental Affidavit requesting that consideration be given to the custody of the child being granted to him; although Mr. Thomas is the putative father, he is not the legal father

7. Sec. 55–10–77, U.C.A.1953 (1969 Pocket Sup.).

8. Sec. 55–10–109, U.C.A.1953 (1969 Pocket Sup.).

9. Sec. 78–11–6, U.C.A.1953.

10. Sec. 75–13–13, U.C.A.1953.

and, therefore, has no legal rights to the child; FURTHER, this Court has previously deprived Mr. Thomas of custody of two other children, Vincent Andre Thomas and Keith Antoine Thomas, Case Nos. 205941 and 205942; said action was taken on September 13, 1965; since that time the children have continued to live in foster homes and Court action has been required to force support payments from Mr. Thomas on behalf of the children; he still is unable to provide for these two children after 3½ years of foster care; FURTHER, it would be contrary to the interest of the above child to follow the same foster care pattern as these other two children;

THEREFORE, IT IS HEREBY ORDERED that the Petition for Custody of the above child filed by James N. Thomas not be set for hearing and that it be dismissed.

While the court was of the opinion (properly so, I think) that the appellant had no right to the child and therefore refused his petition for custody, nevertheless the court made the following finding of fact:

(6) It is in the best interest of the child that the mother and putative father be deprived of the child's custody and the child be placed in the care and custody of the State Department of Public Welfare and the parents should be permanently deprived of all parental rights.

The decree of the court contained the following order:

2. That all parental rights of the mother, Kathleen McMurtrey, and James N. Thomas are hereby permanently terminated and legal custody and guardianship of the person of the above child is hereby placed with the State Department of Public Welfare, a licensed child-placing agency, for placement in a suitable adoptive home; that the said department is hereby ordered to pay for the support and maintenance of said child until the adoptive placement is made

This order was fully justified by the evidence given at the hearing wherein the appellant and his counsel participated fully, and this court should affirm the judgment.[11]

I would therefore affirm the judgment.

11. Shaw v. Jeppson, 121 Utah 155, 239 P.2d 745 (1952).