429 So.2d 699 (1983)
In re the GUARDIANSHIP OF D.A. McW., a Minor, Incompetent.
No. 81-1568.
District Court of Appeal of Florida, Fourth District.
February 2, 1983.
Motions for Rehearing Granted in Part and Denied in Part April 20, 1983.
*700 Mitchell B. Luber of Mitchell B. Luber, P.A., Fort Lauderdale, for appellant Albert McW.
Frank E. Maloney, Jr., of Frank E. Maloney, Jr., P.A., Macclenny, for appellee Emma Nero.
*701 ANSTEAD, Judge.
This is an appeal from a final judgment denying the petition of appellant Albert McWhite for the guardianship and custody of his natural child, and awarding custody to appellee, Emma Nero, the maternal grandmother. We must decide on appeal the legal standard to be applied for determining when custody of a child born out of wedlock may be denied to the natural parent.
The child was born on February 5, 1979, to Vicky Ann Nero and McWhite who, although they were never legally married, had a longstanding relationship. Albert McWhite's name appears on the birth certificate, the baptismal certificate, an acknowledgement filed by McWhite at the hospital when the child was born, and on records of the Florida Department of Health and Rehabilitative Services and the United States Social Security Administration. Vicky Nero died in an automobile accident on June 25, 1981, and on July 13, 1981, McWhite filed a petition for appointment as custodian and guardian of the child. Emma Nero, the maternal grandmother, counterpetitioned.
McWhite maintained that, from the time the child was three months old, the child stayed with him from Monday to Friday while the mother attended college and he cared for the child's needs. McWhite claimed that he and Vicky Nero planned to marry after she helped her mother to buy a new house. McWhite also claimed to have contributed to the child's medical expenses and to have provided food and clothing. He testified that he paid $15.37 per week to H.R.S. for five months so that Vicky and the child could receive federal welfare benefits while she and he were both in school. At the time of the final hearing McWhite was twenty-one years old. He lived with his parents in a two-bedroom house with an enclosed porch and a backyard. His mother is a nurse's aide. He was employed in his father's office cleaning business earning approximately $500 monthly plus the use of two major credit cards. He drove an automobile and a van belonging to the business. He had completed the course requirements for funeral director and planned to enter that business after taking the state examination. McWhite further testified that he had no objection to Mrs. Nero acting as guardian for any recovery due the child for Vicky's wrongful death; he stated that he only wanted custody of his son.
At the time of the hearing Mrs. Nero was thirty-nine years old and divorced. She lived with her two surviving daughters and worked at Motorola earning $266 to $358 per week plus overtime. She testified that she would take a year's leave of absence if granted custody. Although she refused to stipulate that McWhite is the father of her grandson, Mrs. Nero acknowledged that he always claimed to be, that no one else did, and that she herself gave his name as the child's father in applying for social security benefits. Mrs. Nero also contradicted the testimony of her own witness, Byron McKeaton, that Vicky wanted to have a permanent relationship with McWhite. Mrs. Nero contended that the child had resided in her home with his mother since birth, although she admitted that the child spent "one or two nights" weekly with McWhite. She also insisted that she or Vicky had bought all the food, clothing and toys for the child. She declared that McWhite's failure to furnish support forced her daughter to go on welfare.
Mrs. Nero attempted to demonstrate McWhite's unsuitability as a guardian or custodian through testimony that he handled the boy roughly; that he had once slapped Vicky; and that he was a reckless driver; and that Mrs. McWhite, the paternal grandmother, was an alcoholic. For his part, McWhite was also critical of Mrs. Nero. He asserted that she was mentally unfit; that while she works the child is left with her two daughters who are busy with their boyfriends; that the child would have to share a room with the two aunts; and that the house lacks a tub. The trial court found that both McWhite and the grandmother were fit persons to care for the child. However, on the grounds that the interests of the child would be better *702 served, the trial court awarded custody and guardianship to the grandmother with liberal rights of visitation to the father.
In the usual custody case, when the contest is between two parents, both of whom are fit persons and have equal rights to custody, then the polestar test of "best interest of the child" is clearly controlling. Snedaker v. Snedaker, 327 So.2d 72 (Fla. 1st DCA 1976). In other words, all other things being equal, the best interests of the child should control. However, when the contest is between a parent and someone else, the rights of the parent as well as the welfare of the child must be considered.[1]State ex rel. Sparks v. Reeves, 97 So.2d 18 (Fla. 1957). In such cases, the parents' natural right to custody must give way only when the child's welfare requires it or the parent is in some way disabled. In Reeves, for instance, the supreme court approved the temporary grant of custody to the grandparents based upon the father's temporary inability to care for the children after the mother's death, but cautioned that the father would be entitled to custody once the disability was removed.
Florida courts subscribe to the theory that a parent has a natural right to enjoy the custody, fellowship and companionship of his offspring:
While according to the trial Judge a broad judicial discretion in the matter we nevertheless cannot lose sight of the basic proposition that a parent has a natural God-given legal right to enjoy the custody, fellowship and companionship of his offspring. State ex rel. Weaver v. Hamans, 118 Fla. 230, 159 So. 31. This is a rule older than the common law itself and one which had its inception when Adam and Eve gave birth to Cain in the Garden of Eden. Gen. 4:1. In cases such as this one the only limitation on this rule of parental privilege is that as between the parent and the child the ultimate welfare of the child itself must be controlling.
State ex rel. Sparks v. Reeves, 97 So.2d at 20. Also see In re Vermeulen's Petition, 114 So.2d 192 (Fla. 1st DCA 1959); In re Adoption of Noble, 349 So.2d 1215 (Fla. 4th DCA 1977); Behn v. Timmons, 345 So.2d 388 (Fla. 1st DCA 1977). Implicit in the holding in Sparks v. Reeves is a determination that custody cannot be denied to a natural parent, absent some disability on his part. In a case involving circumstances remarkably similar to those at hand, albeit the father was the legal parent, the court declared:
We are not immune or unsympathetic to the appealing position of the appellee-grandparents. Implicit in the attitudes expressed in the cold record we detect the often-occurring and perhaps perfectly natural attitudes of the parents of a deceased mother who envision themselves as the only persons competent and qualified to bestow upon their daughter's children the love and affection which would have come to them if their mother had lived. This is not an uncommon situation especially when the father of the children remarries. Nevertheless, it must not be lost from mind, by them or the Court, that the custody given them, and the care and devotion which they lovingly and willingly bestow upon the children, rests upon a temporary foundation, namely, the inability of the father at the time to care for them. It can and should continue only so long as such disability on his part continues and the welfare of the children requires.
97 So.2d at 20.
At common law a child born out of wedlock was said to be filius nullius, the *703 child of nobody, or filius populi, the child of the people. The putative father had neither rights nor obligations toward the child and was precluded from establishing his paternity of the child in a legal action. Ford v. Loeffler, 363 So.2d 23, 24 (Fla. 3d DCA 1978). From a legal standpoint, such a child simply had no father or mother. 10 Am.Jur.2d § 8 at 848. But the common law has been abrogated by statute in most jurisdictions, affording rights both to the child and to the parents. Most jurisdictions now recognize that the mother is the primary natural guardian of her child and the natural father's rights are secondary. 45 A.L.R.3d 216, 220. Under Florida law the mother's legal right to the care, custody and control of the child is superior to the right of an unwed father unless she is proved to be unfit. Jones v. Smith, 278 So.2d 339 (Fla. 4th DCA 1973), cert. denied, 415 U.S. 958, 94 S.Ct. 1486, 39 L.Ed.2d 573 (1974); see also § 744.301(1), Fla. Stat. (1981).
Historically, apparently because of dissimilarities in their circumstances, policy considerations and problems of proof, the natural father has been denied the parental rights enjoyed by a natural mother or a married father. The landmark case acknowledging parental rights for unwed fathers is Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), in which the Supreme Court overturned an Illinois dependency statute that presumed the unfitness of unwed fathers by denying them a hearing to which all married parents, adoptive parents and unwed mothers were entitled. Stanley appeared to be the reflection of a trend that was developing in many states, including Florida.[2]
In 1967 the First District held, in Mixon v. Mize, 198 So.2d 373 (Fla. 1st DCA 1967), that an unwed father who acknowledges his relationship, manifests an interest and provides support should be granted visitation rights, unless detrimental to the child's welfare. The Mixon court also ordered that the natural father be given notice of any adoption proceedings, this some eight years prior to the promulgation of notice provisions in section 63.062, Florida Statutes. In Brown v. Bray, 300 So.2d 668 (Fla. 1974), the supreme court, in upholding the constitutionality of chapter 742, found that the Florida paternity statute permits a court to grant an unwed father rights similar to those afforded a married father in a dissolution proceeding:
No doubt the court ordinarily would give precedence to the desire of the mother for custody of the child if the desire exists, but in a proper case and upon a proper showing by the father that he seeks custody and is the better fitted and suitable person for the role, the court may in its sound judgment and discretion award the custody of the child to him.
300 So.2d at 670. In 1980, the supreme court declared in Kendrick v. Everheart, 390 So.2d 53 (Fla. 1980), that although an unwed father was precluded from bringing a paternity action under section 742.011, Florida Statutes, he could nevertheless seek a declaratory judgment of paternity under chapter 86. Florida's Adoption Act provides that once a father has taken appropriate action to acknowledge his paternity, his consent, as well as the mother's, is required before the child can be adopted. See § 63.062, Fla. Stat. and Wylie v. Botos, 416 So.2d 1253 (Fla. 4th DCA 1982). The Florida dependency statute also provides that notice must be given to an unwed father who has acknowledged or has been adjudicated the natural father of a child. See § 39.41(3)(a)(2)(c-e), Fla. Stat.
Given the fundamental interest of natural parents in the care, custody and management of their children, and the strong public policy which exists in this *704 state in favor of the natural family unit, we believe that a natural parent of a child born out of wedlock should be denied custody only where it is demonstrated that the parent is disabled from exercising custody or that such custody will, in fact, be detrimental to the welfare of the child.[3]See Sparks v. Reeves; Santosky v. Kramer, 102 S.Ct. at 1391, and Behn v. Timmons, 345 So.2d at 389. In our view, such a rule comports both with natural law and the strong public policy of this state which favors the establishment and continuity of family units.[4] To hold otherwise would be to elevate the rights of non-parents to the same status as that of parents contrary to the holding in Sparks v. Reeves and other decisions.[5] Giving preference to natural fathers who seek custody of their children should also encourage legitimation and thereby reduce the stigma attached to children who otherwise would have no family of their own.
In this case we find that McWhite has established himself to be the natural father. Accordingly, because the trial court found him fit and there is no evidence that the child's welfare will be endangered, we do not believe McWhite can be deprived of custody. We agree that stability and maturity are important factors in determining the best interests of the child. We acknowledge here, for example, that the trial court found that the grandmother was more mature than the natural father and that the child had lived all of his life with its natural mother at the residence of the maternal grandmother. However, we cannot overlook the fact that McWhite is the natural father and has been determined to be a fit person to have custody. In his custody the child can have not only a name but a natural and legal parent and share in the benefits and responsibilities that flow from such a relationship. Together the father and child constitute a family. These factors are not to be gainsaid in determining the child's welfare.
Notwithstanding our conclusions regarding the custody of the child we also believe that the grandmother, under the unique circumstances of this case, is entitled to liberal visitation privileges with the child. An abrupt and complete severance of the child's relationship with his grandmother would obviously be detrimental to the welfare of the child. This is no doubt one of the problems anticipated by the trial court if custody were granted to the father. However, there is no reason why this problem cannot be resolved by granting visitation rights to the grandmother as opposed to the more drastic step of denying custody *705 to the father. There is also no reason, if circumstances indicate it is appropriate, that the trial court cannot retain jurisdiction over the guardianship for purposes of supervision of any wrongful death recovery on behalf of the child.
Accordingly, for the reasons set out above the judgment of the trial court is reversed and this cause is remanded with directions for further proceedings in accord with this opinion.
BERANEK and GLICKSTEIN, JJ., concur.

OPINION ON REHEARING
PER CURIAM.
Both parties have correctly asserted in petitions for rehearing that our prior opinion was not entirely clear on the issue of guardianship of the property of the minor child. By our decision of February 2, 1983, we have left the ruling of the trial court concerning the guardianship of the property intact, with specific directions that the court retain jurisdiction for the purpose of supervising the child's recovery of damages for the wrongful death of his mother. Our decision, of course, is without prejudice to the child's father to participate in the guardianship proceedings for the benefit of the child. In all other respects, the petitions for rehearing, certification or clarification are denied. We also grant the motion of the appellant to strike the Amendment to Motion for Clarification and Motion for Rehearing filed by the appellee which improperly attempts to place before this court matters not contained in the record on appeal.
ANSTEAD, BERANEK, and GLICKSTEIN, JJ., concur.
NOTES
[1] The rights of parents in their children, though privileged, are not absolute. See Drake v. Drake, 386 So.2d 1307 (Fla. 4th DCA 1980). A recognized limitation on the parental privilege for custody is that, between the parent and the child, the welfare of the child must itself be controlling. Sparks v. Reeves. However, that welfare may not be measured solely by material matters, Reeves at 21, or even by the child's preference. In re Vermeulen's Petition, 114 So.2d 192 at 196 (Fla. 1st DCA 1959). Parental rights do not evaporate merely because parents have not been ideal parents. Santosky v. Kramer, 445 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Florida also permits the termination of parental rights on a judicial finding that a parent has abandoned, abused, or neglected a child. See § 39.41(1)(f)(1)(a), Fla. Stat.
[2] In Wilcox v. Jones, 346 So.2d 1037 (Fla. 4th DCA 1977), cert. denied, 357 So.2d 188 (Fla. 1978), this court declared that the equal protection clauses of both state and federal constitutions mandate that an unwed father, like the mother, may maintain an action to recover damages for wrongful death of a child. The Florida Probate Code now provides that, for purposes of intestate secession, a child born out of wedlock may be the lineal descendant of his mother and also of his father, provided paternity is established either before or after the father's death. See § 732.108(2), Fla. Stat.
[3] We recognize that other courts have apparently held to the contrary and we acknowledge apparent conflict with those holdings. See e.g. Scott v. Singleton, 378 So.2d 885 (Fla. 1st DCA 1979).
[4] Today, most jurisdictions recognize that the natural father has, after the mother, a superior right to the child's custody as compared to others who might seek custody of the child. 45 A.L.R.3d 216, 220. In Fierro v. Ljubicich, 5 Misc.2d 202, 165 N.Y.S.2d 290 (1957), it was held that no court can, for any but the gravest reasons, transfer a child from its natural parent to any other person. Fierro declared that the right of a parent, under natural law, to establish a home and bring up children entitles a natural father to custody on death of the mother if he is a fit person. In re Guardianship of C., 98 N.J. Super. 474, 237 A.2d 652 (1967), construed a statute requiring an unwed father to support and educate the child as also giving the father a right of custody second only to that of the mother. See also State in Interest of M., 25 Utah 2d 101, 476 P.2d 1013, 45 A.L.R.3d 206 (1970). In In re Guardianship of Smith, 42 Cal.2d 91, 265 P.2d 888 (1954), the Supreme Court of California found that a natural father of illegitimate children had priority in guardianship and custody proceedings. Also see State ex rel. Lewis v. Lutheran Social Services, 47 Wis.2d 420, 178 N.W.2d 56 (1970). Under this view the child's welfare is presumed to be served by placing the child in the care and custody of his natural parent, and hence, the rule does not operate to subordinate the welfare of the child. See J. Traynor's concurrence in In re Guardianship of Smith, 265 P.2d at 891.
[5] This holding is also consistent with Florida's adoption statute which provides that the consent of the natural father or an excuse therefor must be secured before the father's parental rights may be terminated. Wylie v. Botos, 416 So.2d 1253 (Fla. 4th DCA 1982). Here the father has formally acknowledged his paternity as provided for in the statute, and while the grant of custody in this case is not as severe a step as adoption, in our view the practical consequences would be virtually the same.